(Slip Opinion) OCTOBER TERM, 2018 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## STURGEON *v.* FROST, IN HIS OFFICIAL CAPACITY AS ALASKA REGIONAL DIRECTOR OF THE NATIONAL PARK SERVICE, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 17–949.   Argued November 5, 2018—Decided March 26, 2019

The Alaska National Interest Lands Conservation Act (ANILCA) set aside 104 million acres of federally owned land in Alaska for preservation purposes. With that land, ANILCA created ten new national parks, monuments, and preserves (areas known as "conservation system units"). 16 U. S. C. §3102(4). And in sketching those units' boundary lines, Congress made an uncommon choice—to follow natural features rather than enclose only federally owned lands. It thus swept in a vast set of so-called inholdings—more than 18 million acres of state, Native, and private land. Had Congress done nothing more, those inholdings could have become subject to many National Park Service rules, as the Service has broad authority under its Organic Act to administer both lands and waters within parks across the country. 54 U. S. C. §100751. But Congress added Section 103(c), the provision principally in dispute in this case. Section 103(c)'s first sentence states that "[o]nly" the "public lands"—defined as most federally owned lands, waters, and associated interests— within any system unit's boundaries are "deemed" a part of that unit. 16 U. S. C. §3103(c). The second sentence provides that no state, Native, or private lands "shall be subject to the regulations applicable solely to public lands within [system] units." *Ibid.* And the third sentence permits the Service to "acquire such lands" from "the State, a Native Corporation, or other owner," after which it may "administer[ ]" the land just as it does the other "public lands within such units." *Ibid.*

Petitioner John Sturgeon traveled for decades by hovercraft up a stretch of the Nation River that lies within the boundaries of the

Yukon-Charley Preserve, a conservation system unit in Alaska. On one such trip, Park rangers informed him that the Service's rules prohibit operating a hovercraft on navigable waters "located within [a park's] boundaries." 36 CFR §2.17(e). That regulation—issued under the Service's Organic Act authority—applies to parks nationwide without any "regard to the ownership of submerged lands, tidelands, or lowlands." §1.2(a)(3). Sturgeon complied with the order, but shortly thereafter sought an injunction that would allow him to resume using his hovercraft on his accustomed route. The District Court and the Ninth Circuit denied him relief, interpreting Section 103(c) to limit only the Service's authority to impose Alaska-specific regulations on inholdings—not its authority to enforce nationwide regulations like the hovercraft rule. This Court granted review and rejected that ground for dismissal, but it remanded for consideration of two further questions: whether the Nation River "qualifies as 'public land' for purposes of ANILCA," thus indisputably subjecting it to the Service's regulatory authority; and, if not, whether the Service could nevertheless "regulate Sturgeon's activities on the Nation River." *Sturgeon* v. *Frost*, 577 U. S. ___, ___–___ (*Sturgeon I*). The Ninth Circuit never got past the first question, as it concluded that the Nation River was public land.

*Held*:

1. The Nation River is not public land for purposes of ANILCA. "[P]ublic land" under ANILCA means (almost all) "lands, waters, and interests therein" the "title to which is in the United States." 16 U. S. C. §3102(1)–(3). Because running waters cannot be owned, the United States does not have "title" to the Nation River in the ordinary sense. And under the Submerged Lands Act, it is the State of Alaska—not the United States—that holds "title to and ownership of the lands beneath [the River's] navigable waters." 43 U. S. C. §1311. The Service therefore argues that the United States has "title" to an "interest" in the Nation River under the reserved-water-rights doctrine, which provides that when the Federal Government reserves public land, it can retain rights to the specific "amount of water" needed to satisfy the purposes of that reservation. See *Cappaert* v. *United States*, 426 U. S. 128, 138–141. But even assuming that the Service held such a right, the Nation River itself would not thereby become "public land" in the way the Service contends. Under ANILCA, the "public land" would consist only of the Federal Government's specific "interest" in the River—*i.e.,* its reserved water right. And that right, the Service agrees, merely allows it to protect waters in the park from depletion or diversion. The right could not justify applying the hovercraft rule on the Nation River, as that rule targets nothing of the kind. Pp. 12–15.

2. Non-public lands within Alaska's national parks are exempt from the Park Service's ordinary regulatory authority. Section 103(c) arose out of concern from the State, Native Corporations, and private individuals that ANILCA's broadly drawn boundaries might subject their properties to Park Service rules. Section 103(c)'s first sentence therefore sets out which land within those new parks qualify as parkland—"[o]nly" the "public lands" within any system unit's boundaries are "deemed" a part of that unit. By negative implication, non-public lands are "deemed" outside the unit. In other words, non-federally owned lands inside system units (on a map) are declared outside them (for the law). The effect of that exclusion, as Section 103(c)'s second sentence affirms, is to exempt non-public lands, including waters, from Park Service regulations. That is, the Service's rules will apply "solely" to public lands within the units. 16 U. S. C. §3103(c). And for that reason, the third sentence provides a kind of escape hatch—it allows the Service to acquire inholdings when it believes regulation of those lands is needed.

The Service's alternative interpretation of Section 103(c) is unpersuasive. The provision's second sentence, it says, means that if a Park Service regulation on its face applies "solely" to public lands, then the regulation cannot apply to non-public lands. But if instead the regulation covers public and non-public lands alike, then the second sentence has nothing to say: The regulation can indeed cover both. On that view, Section 103(c)'s second sentence is a mere truism, not any kind of limitation. It does nothing to exempt inholdings from any regulation that might otherwise apply. And because that is so, the Government's reading also strips the first and third sentences of their core functions. The first sentence's "deeming" has no point, since there is no reason to pretend that inholdings are not part of a park if they can still be regulated as parklands. And the third sentence's acquisition option has far less utility if the Service has its full regulatory authority over lands the Federal Government does not own. This sort of statute-gutting cannot be squared with ANILCA's text and context. Pp. 16–26.

3. Navigable waters within Alaska's national parks—no less than other non-public lands—are exempt from the Park Service's normal regulatory authority. The Service argues that, if nothing else, ANILCA must at least allow it to regulate navigable waters. The Act, however, does not readily allow the decoupling of navigable waters from other non-federally owned areas in Alaskan national parks. ANILCA defines "land" to mean "lands, waters, and interests therein," §3102(1)–(3); so when it refers to "lands" in Section 103(c) (and throughout the Act) it means waters as well. Nothing in the few aquatic provisions to which the Service points conflicts with reading

Section 103(c)'s regulatory exemption to cover navigable waters. The Government largely relies on the Act's statements of purpose, but this Court's construction leaves the Service with multiple tools to "protect" and "preserve" rivers in Alaska's national parks, as those provisions anticipate. See, *e.g.*, §§3181(j), 3191(b)(7). While such authority might fall short of the Service's usual power, it accords with ANILCA's "repeated[ ] recogni[tion]" that Alaska is "the exception, not the rule." *Sturgeon I*, 577 U. S., at ___. Pp. 26–29.

872 F. 3d 927, reversed and remanded.

KAGAN, J., delivered the opinion for a unanimous Court. SOTOMAYOR, J., filed a concurring opinion, in which GINSBURG, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 17–949

JOHN STURGEON, PETITIONER *v.* BERT FROST, IN HIS OFFICIAL CAPACITY AS ALASKA REGIONAL DIRECTOR OF THE NATIONAL PARK SERVICE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[March 26, 2019]

JUSTICE KAGAN delivered the opinion of the Court.

This Court first encountered John Sturgeon's lawsuit three Terms ago. See *Sturgeon* v. *Frost*, 577 U. S. ___ (2016) (*Sturgeon I*). As we explained then, Sturgeon hunted moose along the Nation River in Alaska for some 40 years. See *id.,* at ___ (slip op., at 1). He traveled by hovercraft, an amphibious vehicle able to glide over land and water alike. To reach his favorite hunting ground, he would pilot the craft over a stretch of the Nation River that flows through the Yukon-Charley Rivers National Preserve, a unit of the federal park system managed by the National Park Service. On one such trip, park rangers informed Sturgeon that a Park Service regulation prohibits the use of hovercrafts on rivers within any federal preserve or park. Sturgeon complied with their order to remove his hovercraft from the Yukon-Charley, thus "heading home without a moose." *Id.,* at ___ (slip op., at 6). But soon afterward, Sturgeon sued the Park Service, seeking an injunction that would allow him to resume using his hovercraft on his accustomed route. The lower

courts denied him relief. This Court, though, thought there was more to be said. See *id.,* at ___–___ (slip op., at 15–16).

As we put the matter then, Sturgeon's case raises the issue how much "Alaska is different" from the rest of the country—how much it is "the exception, not the rule." *Id.,* at ___–___ (slip op., at 13–14). The rule, just as the rangers told Sturgeon, is that the Park Service may regulate boating and other activities on waters within national parks—and that it has banned the use of hovercrafts there. See 54 U. S. C. §100751(b); 36 CFR §2.17(e) (2018). But Sturgeon claims that Congress created an Alaska-specific exception to that broad authority when it enacted the Alaska National Interest Lands Conservation Act (ANILCA), 94 Stat. 2371, 16 U. S. C. §3101 *et seq.* In Alaska, Sturgeon argues, the Park Service has no power to regulate lands or waters that the Federal Government does not own; rather, the Service may regulate only what ANILCA calls "public land" (essentially, federally owned land) in national parks. And, Sturgeon continues, the Federal Government does not own the Nation River—so the Service cannot ban hovercrafts there. When we last faced that argument, we disagreed with the reason the lower courts gave to reject it. But we remanded the case for consideration of two remaining questions. First, does "the Nation River qualif[y] as 'public land' for purposes of ANILCA"? 577 U. S., at ___ (slip op., at 15). Second, "even if the [Nation] is not 'public land,'" does the Park Service have authority to "regulate Sturgeon's activities" on the part of the river in the Yukon-Charley? *Id.,* at ___ (slip op., at 16). Today, we take up those questions, and answer both "no." That means Sturgeon can again rev up his hovercraft in search of moose.

# I

## A

We begin, as *Sturgeon I* did, with a slice of Alaskan history. The United States purchased Alaska from Russia in 1867. It thereby acquired "[i]n a single stroke" 365 million acres of land—an area more than twice the size of Texas. *Id.,* at \_\_\_ (slip op., at 2). You might think that would be enough to go around. But in the years since, the Federal Government and Alaskans (including Alaska Natives) have alternately contested and resolved and contested and . . . so forth who should own and manage that bounty. We offer here a few highlights because they are the backdrop against which Congress enacted ANILCA. As we do so, you might catch a glimpse of some former-day John Sturgeons—who (for better or worse) sought greater independence from federal control and, in the process, helped to shape the current law.

For 90 years after buying Alaska, the Federal Government owned all its land. At first, those living in Alaska—a few settlers and some 30,000 Natives—were hardly aware of that fact. See E. Gruening, The State of Alaska 355 (1968). American citizens mocked the Alaska purchase as Secretary of State "Seward's Folly" and President Johnson's "Polar Bear Garden." They paid no attention to the new area, leading to an "era of total neglect." *Id.,* at 31. But as *Sturgeon I* recounted, the turn of the century brought "newfound recognition of Alaska's economic potential." 577 U. S., at \_\_\_ (slip op., at 2). Opportunities to mine, trap, and fish attracted tens of thousands more settlers and sparked an emerging export economy. And partly because of that surge in commercial activity, the country's foremost conservationists—President Theodore Roosevelt and Gifford Pinchot, chief of the fledgling Forest Service—took unprecedented action to protect Alaska's natural resources. In particular, Roosevelt (and then President Taft) prevented settlers from logging or coal

mining on substantial acreage. See W. Borneman, Alaska: Saga of a Bold Land 240–241 (2003). Alaskans responded by burning Pinchot in effigy and, more creatively, organizing the "Cordova Coal Party"—a mass dumping of imported Canadian coal (instead of English tea) into the Pacific Ocean (instead of Boston Harbor). See *ibid.* The terms of future conflict were thus set: resource conservation vs. economic development, federal management vs. local control.

By the 1950s, Alaskans hankered for both statehood and land—and Congress decided to give them both. In pressing for statehood, Alaska's delegate to the House of Representatives lamented that Alaskans were no better than "tenants upon the estate of the national landlord"; and Alaska's Governor (then a Presidential appointee) called on the country to "[e]nd American [c]olonialism." W. Everhart, The National Park Service 126–127 (1983) (Everhart). Ever more aware of Alaska's economic and strategic importance, Congress agreed the time for statehood had come. The 1958 Alaska Statehood Act, 72 Stat. 339, made Alaska the country's 49th State. And because the new State would need property—to propel private industry and create a tax base—the Statehood Act made a land grant too. Over the next 35 years, Alaska could select for itself 103 million acres of "vacant, unappropriated, and unreserved" federal land—an area totaling the size of California. §§6(a)–(b), 72 Stat. 340, as amended; see Everhart 127. And more: By incorporating the Submerged Lands Act of 1953, the Statehood Act gave Alaska "title to and ownership of the lands beneath navigable waters," such as the Nation River. 43 U. S. C. §1311; see §6(m), 72 Stat. 343. And a State's title to the lands beneath navigable waters brings with it regulatory authority over "navigation, fishing, and other public uses" of those waters. *United States* v. *Alaska*, 521 U. S. 1, 5 (1997). All told, the State thus emerged a formidable property holder.

But the State's bonanza provoked land claims from Alaska Natives. Their ancestors had lived in the area for thousands of years, and they asserted aboriginal title to much of the property the State was now taking (and more besides). See Everhart 127. When their demands threatened to impede the trans-Alaska pipeline, Congress stepped in. The Alaska Native Claims Settlement Act of 1971 (ANCSA) extinguished the Natives' aboriginal claims. See 85 Stat. 688, as amended, 43 U. S. C. §1601 *et seq.* But it granted the Natives much in return. Under the law, corporations organized by groups of Alaska Natives could select for themselves 40 million acres of federal land—equivalent, when combined, to all of Pennsylvania. See §§1605, 1610–1615. So the Natives became large landowners too.

Yet one more land dispute loomed. In addition to settling the Natives' claims, ANCSA directed the Secretary of the Interior (Secretary) to designate, subject to congressional approval, 80 million more acres of federal land for inclusion in the national park, forest, or wildlife systems. See §1616(d)(2). The Secretary dutifully made his selections, but Congress failed to ratify them within the five-year period ANCSA had set. Rather than let the designations lapse, President Carter invoked another federal law (the 1906 Antiquities Act) to proclaim most of the lands (totaling 56 million acres) national monuments, under the National Park Service's aegis. See 577 U. S., at \_\_\_ (slip op., at 4). Many Alaskans balked. "[R]egard[ing] national parks as just one more example of federal interference," protesters demonstrated throughout the State and several thousand joined in the so-called Great Denali-McKinley Trespass. Everhart 129; see 577 U. S., at \_\_\_ (slip op., at 4). "The goal of the trespass," as *Sturgeon I* explained, "was to break over 25 Park Service rules in a two-day period." *Ibid.* One especially eager participant played a modern-day Paul Revere, riding on horseback through the

crowd to deliver the message: "The Feds are coming! The Feds are coming!" *Ibid.* (internal quotation marks omitted).

And so they were—but not in quite the way President Carter had contemplated. Responding to the uproar his proclamation had set off, Congress enacted a third major piece of legislation allocating land in Alaska. We thus reach ANILCA, the statute principally in dispute in this case, in which Congress set aside extensive land for national parks and preserves—but on terms different from those governing such areas in the rest of the country.

### B

Starting with the statement of purpose in its first section, ANILCA sought to "balance" two goals, often thought conflicting. 16 U. S. C. §3101(d). The Act was designed to "provide[] sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska." *Ibid.* "[A]nd at the same time," the Act was framed to "provide[] adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people." *Ibid.* So if, as you continue reading, you see some tension within the statute, you are not mistaken: It arises from Congress's twofold ambitions.

ANILCA set aside 104 million acres of federally owned land in Alaska for preservation purposes. See 577 U. S., at ___ (slip op., at 5). In doing so, the Act rescinded President Carter's monument designations. But it brought into the national park, forest, or wildlife systems millions more acres than even ANCSA had contemplated. The park system's share of the newly withdrawn land (to be administered, as usual, by the Park Service) was nearly 44 million acres—an amount that more than doubled the system's prior (nationwide) size. See Everhart 132. With that land, ANILCA created ten new national parks, mon-

uments, and preserves—including the Yukon-Charley Preserve—and expanded three old ones. See §§410hh, 410hh–1. In line with the Park Service's usual terminology, ANILCA calls each such park or other area a "conservation system unit." §3102(4) ("The term . . . means any unit in Alaska of the National Park System"); see 54 U. S. C. §100102(6) (similar).

In sketching those units' boundary lines, Congress made an uncommon choice—to follow "topographic or natural features," rather than enclose only federally owned lands. §3103(b); see Brief for Respondents 24 (agreeing that "ANILCA [is] atypical in [this] respect"). In most parks outside Alaska, boundaries surround mainly federal property holdings. "[E]arly national parks were carved out of a larger public domain, in which virtually all land" was federally owned. Sax, Helpless Giants: The National Parks and the Regulation of Private Lands, 75 Mich. L. Rev. 239, 263 (1976); see Dept. of Interior, Nat. Park Serv., Statistical Abstract 87 (2017) (Table 9) (noting that only 2 of Yellowstone's 2.2 million acres are in non-federal hands). And even in more recently established parks, Congress has used gerrymandered borders to exclude most non-federal land. See Sax, Buying Scenery, 1980 Duke L. J. 709, 712, and n. 12. But Congress had no real way to do that in Alaska. Its prior cessions of property to the State and Alaska Natives had created a "confusing patchwork of ownership" all but impossible to draw one's way around. C. Naske & H. Slotnick, Alaska: A History 317 (3d ed. 2011). What's more, an Alaskan Senator noted, the United States might want to reacquire state or Native holdings in the same "natural areas" as reserved federal land; that could occur most handily if Congress drew boundaries, "wherever possible, to encompass" those holdings and authorized the Secretary to buy whatever lay inside. 126 Cong. Rec. 21882 (1980) (remarks of Sen. Stevens). The upshot was a vast set of so-called inhold-

ings—more than 18 million acres of state, Native, and private land—that wound up inside Alaskan system units. See 577 U. S., at ___–___ (slip op., at 5–6).

Had Congress done nothing more, those inholdings could have become subject to many Park Service rules—the same kind of "restrictive federal regulations" Alaskans had protested in the years leading up to ANILCA (and further back too). *Id.*, at ___ (slip op., at 4). That is because the Secretary, acting through the Director of the Park Service, has broad authority under the National Park Service Organic Act (Organic Act), 39 Stat. 535, to administer both lands and waters within all system units in the country. See 54 U. S. C. §§100751, 100501, 100102. The Secretary "shall prescribe such regulations as [he] considers necessary or proper for the use and management of System units." §100751(a). And he may, more specifically, issue regulations concerning "boating and other activities on or relating to water located within System units." §100751(b). Those statutory grants of power make no distinctions based on the ownership of either lands or waters (or lands beneath waters).[1] And although the Park Service has sometimes chosen not to regulate non-federally owned lands and waters, it has also imposed major restrictions on their use. Rules about mining and solid-waste disposal, for example, apply to all lands within system units "whether federally or nonfederally owned." 36 CFR §6.2; see §9.2. And (of particular note here) the Park Service freely regulates activities on all navigable (and some other) waters "within [a park's] boundaries"—once more, "without regard to . . . ownership." §1.2(a)(3). So Alaska and its Natives had reason to worry about how

_____

[1] None of the parties here have questioned the constitutional validity of the above statutory grants as applied to inholdings, and we therefore do not address the issue. Cf. *Kleppe* v. *New Mexico*, 426 U. S. 529, 536–541 (1976); *Kansas* v. *Colorado*, 206 U. S. 46, 88–89 (1907).

the Park Service would regulate their lands and waters within the new parks.

Congress thus acted, as even the Park Service agrees, to give the State and Natives "assurance that their [lands] wouldn't be treated just like" federally owned property. Tr. of Oral Arg. 50. (It is only—though this is quite a large "only"—the nature and extent of that assurance that is in dispute.) The key provision here is Section 103(c), which contains three sentences that may require some re-reading. We quote it first in one block; then provide some definitions; then go over it again a bit more slowly. But still, you should expect to return to this text as you proceed through this opinion.

Section 103(c) provides in full:

> "Only those lands within the boundaries of any conservation system unit which are public lands (as such term is defined in this Act) shall be deemed to be included as a portion of such unit. No lands which, before, on, or after [the date of ANILCA's passage], are conveyed to the State, to any Native Corporation, or to any private party shall be subject to the regulations applicable solely to public lands within such units. If the State, a Native Corporation, or other owner desires to convey any such lands, the Secretary may acquire such lands in accordance with applicable law (including this Act), and any such lands shall become part of the unit, and be administered accordingly." §3103(c).

Now for the promised definitions. The term "land," as found in all three sentences, actually—and crucially for this case—"means lands, waters, and interests therein." §3102(1). The term "public lands," in the first two sentences, then means "lands" (including waters and interests therein) "the title to which is in the United States"—except for lands selected for future transfer to the State or

Native Corporations (under the Statehood Act or ANCSA). §3102(2), (3); see *supra,* at 4–5. "Public lands" are therefore most but not quite all lands (and again, waters and interests) that the Federal Government owns.

Finally, to recap. As explained in *Sturgeon I*, "Section 103(c) draws a distinction between 'public' and 'non-public' lands within the boundaries of conservation system units in Alaska." 577 U. S., at __ (slip op., at 14). Section 103(c)'s first sentence makes clear that only public lands (again, defined as most federally owned lands, waters, and associated interests) would be considered part of a system unit (again, just meaning a national park, preserve, or similar area). By contrast, state, Native, or private lands would not be understood as part of such a unit, even though they in fact fall within its geographic boundaries. Section 103(c)'s second sentence then expressly exempts all those non-public lands (the inholdings) from certain regulations—though exactly which ones, as will soon become clear, is a matter of dispute. And last, Section 103(c)'s third sentence enables the Secretary to buy any inholdings. If he does, the lands (because now public) become part of the park, and may be administered in the usual way—*e.g.,* without the provision's regulatory exemption.

C

We can now return to John Sturgeon, on his way to a hunting ground alternatively dubbed "Moose Meadows" or "Sturgeon Fork." As recounted above, Sturgeon used to travel by hovercraft up a stretch of the Nation River that lies within the boundaries of the Yukon-Charley Preserve. See *supra,* at 1. Until one day, three park rangers approached Sturgeon while he was repairing his steering cable and told him he was violating a Park Service rule. According to the specified regulation, "[t]he operation or use of hovercraft is prohibited" on navigable (and some

other) waters "located within [a park's] boundaries," with-out any "regard to . . . ownership." 36 CFR §§2.17(e), 1.2(a)(3); see *supra,* at 2. That regulation, issued under the Secretary's Organic Act authority, applies on its face to parks across the country. See *supra,* at 8 (describing Organic Act). And Sturgeon did not doubt that the Nation River is a navigable water. But Sturgeon protested that in Alaska (even though nowhere else) the rule could not be enforced on a waterway—like, he said, the Nation River—that is not owned by the Federal Government. And when his objection got nowhere with the rangers (or with the Secretary, to whom he later petitioned), Sturgeon stopped using his hovercraft—but also brought this lawsuit, based on ANILCA's Section 103(c).

In *Sturgeon I,* we rejected one ground for dismissing Sturgeon's case, but remanded for consideration of two further questions. The District Court and Court of Appeals for the Ninth Circuit had held that even assuming the Nation River is non-public land, the Park Service could enforce its hovercraft ban there. See 2013 WL 5888230 (Oct. 30, 2013); 768 F. 3d 1066 (2014). Those two courts interpreted Section 103(c) to limit only the Service's authority to impose Alaska-specific regulations on such lands—not its authority to apply nationwide regulations like the hovercraft rule. But we viewed that construction as "implausible." 577 U. S., at \_\_\_ (slip op., at 15). ANILCA, we reasoned, "repeatedly recognizes that Alaska is different." *Id.,* at \_\_\_ (slip op., at 13); see *id.,* at \_\_\_ (slip op., at 14) (The Act "reflect[s] the simple truth that Alaska is often the exception, not the rule"). Yet the lower courts' reading would "prevent the Park Service from recognizing Alaska's unique conditions"—thus producing a "topsy-turvy" result. *Ibid.* Still, we thought two hurdles remained before Sturgeon could take his hovercraft out of storage. We asked the Court of Appeals to decide whether the Nation River "qualifies as 'public land' for purposes of

ANILCA," thus indisputably subjecting it to the Service's regulatory authority. *Id.,* at ___ (slip op., at 15). And if the answer was "no," we asked the Ninth Circuit to address whether the Service, on some different theory from the one just dispatched, could still "regulate Sturgeon's activities on the Nation River." *Id.,* at ___ (slip op., at 16).

The Ninth Circuit never got past the first question because it concluded that the Nation River is "public land[.]" See 872 F. 3d 927, 936 (2017). The court explained that it was bound by three circuit decisions construing that term, when used in ANILCA's provisions about subsistence fishing, as including all navigable waters. *Id.,* at 933–934. Accordingly, the court again rejected Sturgeon's challenge. *Id.,* at 936.

And we again granted certiorari. 585 U. S. ___ (2018).

## II

We first address whether, as the Ninth Circuit found, the Nation River is "public land" under ANILCA. As defined, once again, that term means (almost all) "lands, waters, and interests therein" the "title to which is in the United States." 16 U. S. C. §3102(1)–(3). If the Nation River comes within that definition, even Sturgeon agrees that the Park Service may enforce its hovercraft rule in the stretch traversing the Yukon-Charley. That is because the Organic Act authorizes the Park Service to regulate boating and similar activities in parks and other system units—and under ANILCA's Section 103(c) those units include all "public land" within their boundaries. 54 U. S. C. §100751(a)–(b); 16 U. S. C. §3103(c); see *supra,* at 8–10.

But the United States does not have "title" (as the just-quoted definition demands) to the Nation River in the ordinary sense. As the Park Service acknowledges, running waters cannot be owned—whether by a government or by a private party. See *FPC* v. *Niagara Mohawk Power*

*Corp.*, 347 U. S. 239, 247, n. 10 (1954); Brief for Respondents 33. In contrast, the lands beneath those waters—typically called submerged lands—can be owned, and the water regulated on that basis. But that does not help the Park Service because, as noted earlier, the Submerged Lands Act gives each State "title to and ownership of the lands beneath [its] navigable waters." 43 U. S. C. §1311; see *supra,* at 4. That means Alaska, not the United States, has title to the lands beneath the Nation River.

So the Park Service argues instead that the United States has "title" to an "interest" in the Nation River, under what is called the reserved-water-rights doctrine. See Brief for Respondents 32–37. The canonical statement of that doctrine goes as follows: "[W]hen the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation." *Cappaert* v. *United States*, 426 U. S. 128, 138 (1976). For example, this Court decided that in reserving land for an Indian tribe, the Government impliedly reserved sufficient water from a nearby river to enable the tribe to farm the area. See *Winters* v. *United States*, 207 U. S. 564, 576 (1908). And similarly, we held that in creating a national monument to preserve a species of fish inhabiting an underground pool, the United States acquired an enforceable interest in preventing others from depleting the pool below the level needed for the fish to survive. See *Cappaert*, 426 U. S., at 147. According to the Park Service, the United States has an analogous interest in the Nation River and other navigable waters in Alaska's national parks. "Because th[e] purposes [of those parks] require that the waters within [them] be safeguarded against depletion and diversion," the Service contends, "Congress's reservations of park lands also reserved interests in appurtenant navigable waters." Brief for Respond-

ents 35.

That argument first raises the question whether it is even possible to hold "title," as ANILCA uses the term, to reserved water rights. 16 U. S. C. §3102(2). Those rights, as all parties agree, are "usufructuary" in nature, meaning that they are rights for the Government to use—whether by withdrawing or maintaining—certain waters it does not own. See *Niagara Mohawk Power Corp.*, 347 U. S., at 246; Brief for Petitioner 36; Brief for Respondents 36. The Park Service has found a couple of old cases suggesting that a person can hold "title" to such usufructuary interests. See *ibid.*; *Crum* v. *Mt. Shasta Power Corp.*, 220 Cal. 295, 307, 30 P. 2d 30, 36 (1934); *Radcliff's Ex'rs* v. *Mayor of Brooklyn*, 4 N. Y. 195, 196 (1850). But the more common understanding, recently noted in another ANILCA case, is that "reserved water rights are not the type of property interests to which title can be held"; rather, "the term 'title' applies" to "fee ownership of property" and (sometimes) to "possessory interests" in property like those granted by a lease. See *Totemoff* v. *State*, 905 P. 2d 954, 965 (Alaska 1995) (collecting cases); Brief for State of Idaho et al. as *Amici Curiae* 21–22 (same). And we see no evidence that the Congress enacting ANILCA meant to use the term in any less customary and more capacious sense.

But even assuming so, the Nation River itself would not thereby become "public land" in the way the Park Service argues. Under ANILCA's definition, the "public land" at issue would consist only of the Federal Government's specific "interest" in the River—that is, its reserved water right. §3102(1), (3). And that reserved right, by its nature, is limited. It does not give the Government plenary authority over the waterway to which it attaches. Rather, the interest merely enables the Government to take or maintain the specific "amount of water"—and "no more"—required to "fulfill the purpose of [its land] reservation."

*Cappaert*, 426 U. S., at 141. So, for example, in the cases described above, the Government could control only the volume of water necessary for the tribe to farm or the fish to survive. See *Winters*, 207 U. S., at 576–577; *Cappaert*, 426 U. S., at 141. And likewise here, the Government could protect "only th[e] amount of water" in the Nation River needed to "accomplish the purpose of the [Yukon-Charley's] reservation." *Id.,* at 138, 141.

And whatever that volume, the Government's (purported) reserved right could not justify applying the hovercraft rule on the Nation River. That right, to use the Park Service's own phrase, would support a regulation preventing the "depletion or diversion" of waters in the River (up to the amount required to achieve the Yukon-Charley's purposes). Brief for Respondents 34–35. But the hovercraft rule does nothing of that kind. A hovercraft moves above the water, on a thin cushion of air produced by downward-directed fans; it does not "deplet[e]" or "diver[t]" any water. Nor has the Park Service explained the hovercraft rule as an effort to protect the Nation River from pollution or other similar harm. To the contrary, that rule is directed against the "sight or sound" of "motorized equipment" in remote locations—concerns not related to safeguarding the water. 48 Fed. Reg. 30258 (1983). So the Park Service's "public lands" argument runs aground: Even if the United States holds title to a reserved water right in the Nation River, that right (as opposed to title in the River itself) cannot prevent Sturgeon from wafting along the River's surface toward his preferred hunting ground.[2]

—————

[2] As noted earlier, the Ninth Circuit has held in three cases—the so-called *Katie John* trilogy—that the term "public lands," when used in ANILCA's subsistence-fishing provisions, encompasses navigable waters like the Nation River. See *Alaska* v. *Babbitt*, 72 F. 3d 698 (1995); *John* v. *United States*, 247 F. 3d 1032 (2001) (en banc); *John* v. *United States*, 720 F. 3d 1214 (2013); *supra*, at 12. Those provisions are

## III

We thus move on to the second question we posed in
*Sturgeon I*, concerning the Park Service's power to regu-
late even non-public lands and waters within Alaska's
system units (or, in our unofficial terminology, national
parks). The Service principally relies on that sort of
ownership-indifferent authority in defending its decision to
expel Sturgeon's hovercraft from the Nation River. See
Brief for Respondents 16–18, 25–32. And we can see why.
If Sturgeon lived in any other State, his suit would not
have a prayer of success. As noted earlier, the Park Ser-
vice has used its Organic Act authority to ban hovercrafts
on navigable waters "located within [a national park's]
boundaries" without any "regard to . . . ownership." 36
CFR §§2.17(e), 1.2(a)(3); see *supra,* at 10–11. And no one
disputes that Sturgeon was driving his hovercraft on a
stretch of the Nation River (a navigable water) inside the
borders of the Yukon-Charley (a national park). So case
closed. Except that Sturgeon lives in Alaska. And as we
have said before, "Alaska is often the exception, not the
rule." *Sturgeon I,* 577 U. S., at ___ (slip op., at 14). Here,
Section 103(c) of ANILCA makes it so. As explained be-
low, that section provides that even when non-public
lands—again, including waters—are geographically within
a national park's boundaries, they may not be regulated as
part of the park. And that means the Park Service's hov-
ercraft regulation cannot apply there.[3]

-----

not at issue in this case, and we therefore do not disturb the Ninth
Circuit's holdings that the Park Service may regulate subsistence
fishing on navigable waters. See generally Brief for State of Alaska as
*Amicus Curiae* 29–35 (arguing that this case does not implicate those
decisions); Brief for Ahtna, Inc., as *Amicus Curiae* 30–36 (same).

[3] Because we see, for the reasons given below, no ambiguity as to
Section 103(c)'s meaning, we cannot give deference to the Park Ser-
vice's contrary construction. See *Chevron U. S. A. Inc.* v. *Natural
Resources Defense Council, Inc.*, 467 U. S. 837, 842 (1984) ("If the intent

To understand why, first recall how Section 103(c) grew out of ANILCA's unusual method for drawing park boundaries. See *supra,* at 7–8. Those lines followed the area's "natural features," rather than (as customary) the Federal Government's property holdings. 16 U. S. C. §3103(b). The borders thus took in immense tracts owned by the State, Native Corporations, and private individuals. And as you might imagine, none of those parties was eager to have its lands newly regulated as national parks. To the contrary, all of them wanted to preserve the regulatory status quo—to prevent ANILCA's maps from subjecting their properties to the Park Service's rules. Hence arose Section 103(c). Cf. Tr. of Oral Arg. 50 (Solicitor General acknowledging that Section 103(c) responds to the State's and Native Corporations' "concern[s]" about the effects of "includ[ing their lands] within the outer boundaries" of the new parks). Now might be a good time to review that provision, block quoted above. See *supra,* at 9. In broad brush strokes, *Sturgeon I* described it as follows: "Section 103(c) draws a distinction between 'public' and 'non-public' lands," including waters, "within the boundaries of [Alaska's] conservation system units." 577 U. S., at ___ (slip op., at 14).

Section 103(c)'s first sentence sets out the essential distinction, relating to what qualifies as parkland. It provides, once again, that "[o]nly" the "public lands" (essentially, the federally owned lands) within any system unit's boundaries would be "deemed" a part of that unit. §3103(c). The non-public lands (everything else) were, by negative implication, "deemed" not a part of the unit— even though within the unit's geographic boundaries. The key word here is "deemed." That term is used in legal materials "[t]o treat (something) as if . . . it were really something else." Black's Law Dictionary 504 (10th ed.

————————

of Congress is clear, that is the end of the matter").

2014).   Legislators (and other drafters) find the word
"useful" when "it is necessary to establish a legal fiction,"
either by "'deeming' something to be what it is not" or by
"'deeming' something not to be what it is." *Ibid.* (quoting
G.C. Thornton, Legislative Drafting 99 (4th ed. 1996)).
The fiction in Section 103(c) involves considering certain
lands actually within the new national parks as instead
without them.  As a matter of geography, both public and
non-public lands fall inside those parks' boundaries.  But
as a matter of law, only public lands would be viewed as
doing so.  All non-public lands (again, including waters)
would be "deemed," abracadabra-style, outside Alaska's
system units.[4]

The effect of that exclusion, as Section 103(c)'s second
sentence affirms, is to exempt non-public lands, including
waters, from the Park Service's ordinary regulatory au-
thority.  Recall that the Organic Act pegs that authority to
system units.  See *supra,* at 8.  The Service may issue
rules thought "necessary or proper" for "System units."  54
U. S. C. §100751(a).  And more pertinently here, the Ser-
vice may prescribe rules about activities on "water located
within System units."  §100751(b).  Absent Section 103(c),
those grants of power enable the Service to administer
even non-federally owned waters or lands inside national
parks.  See *supra,* at 8.  But add Section 103(c), and the
equation changes.  Now, according to that section's first
sentence, non-federally owned waters and lands inside
system units (on a map) are declared outside them (for the

——————

[4] Consistent with that approach, Congress left out non-public lands in
calculating the acreage of every new or expanded system unit. Sections
201 and 202 of ANILCA, in describing those units, state the acreage of
only their public lands. See, *e.g.,* §410hh(1) (providing that Aniakchak
National Preserve would "contain[] approximately [367,000] acres of
public lands"); §410hh–1(3) (providing that Denali National Park would
grow "by the addition of an area containing approximately [2,426,000]
acres of public land").

law). So those areas are no longer subject to the Service's power over "System units" and the "water located within" them. §100751(a), (b). Instead, only the federal property in system units is subject to the Service's authority.[5] And that is just what Section 103(c)'s second sentence pronounces, for waters and lands alike. Again, that sentence says that no state, Native, or private lands "shall be subject to the regulations applicable solely to public lands within [system] units." 16 U. S. C. §3103(c). The sentence thus expressly states the consequence of the statute's prior "deeming." The Service's rules will apply exclusively to public lands (meaning federally owned lands and waters) within system units. The rules cannot apply to any non-federal properties, even if a map would show they are within such a unit's boundaries. Geographic inholdings thus become regulatory outholdings, impervious to the Service's ordinary authority.[6]

————————

[5] At times, the Park Service has argued here that the Organic Act gives it authority to regulate waters outside system units, so long as doing so protects waters or lands inside them. See Brief for Respondents 28–32. If so, the argument goes, that authority would similarly permit the Service to regulate the non-federally owned waters that Section 103(c) has deemed outside Alaskan system units, if and when needed to conserve those units' federal waters or lands. But at other points in this litigation, the Service has all but disclaimed such out-of-the-park regulatory authority. See No. 14–1209, Tr. of Oral Arg. 58 (Jan. 20, 2016) ("The Park Service [has] consistently understood its authority to be regulating [within] the park's boundaries. It's never sought to enact a regulation outside of the park's boundaries"). We take no position on the question because it has no bearing on the hovercraft rule at issue here. That rule, by its express terms, applies only inside system units. See *supra,* at 10–11. It therefore does not raise any question relating to the existence or scope of the Service's authority over water outside system units.

[6] Another provision of ANILCA reflects that result. Right after Sections 201 and 202 describe each new or expanded system unit by reference to how many acres of public land it contains, see n. 4, *supra*, Section 203 authorizes the Park Service to administer, under the Organic Act, the areas listed in "the foregoing sections." §410hh–2. In

And for that reason, Section 103(c)'s third sentence provides a kind of escape hatch—for times when the Park Service believes regulation of the inholdings is needed. In that event, "the Secretary may acquire such lands" from "the State, a Native Corporation, or other owner." §3103(c). (As noted earlier, facilitating those acquisitions was one reason Congress put non-federal lands inside park boundaries in the first instance. See *supra,* at 7.) When the Secretary makes such a purchase, the newly federal land "become[s] part of the [system] unit." §3101(c). And the Park Service may then "administer[]" the land just as it does (in the second sentence's phrase) the other "public lands within such units." *Ibid.* In thus providing a way out of the Section's first two sentences, the third underlines what they are doing: insulating the state, Native, or private lands that ANILCA enclosed in national parks from new and unexpected regulation. In sum, those lands may be regulated only as they could have been before ANILCA's enactment, unless and until bought by the Federal Government.

The Park Service interprets Section 103(c) differently, relying wholly on its second sentence and mostly on the single word "solely" there. True enough, the Service acknowledges, that anxiety about how it would regulate inholdings was "really what drove [Section] 103(c)." Tr. of Oral Arg. 46; see *supra,* at 9, 17. But still, the Service argues, the Section's second sentence exempts those non-public lands from only "one particular class of Park Service regulations"—to wit, rules "'applicable *solely to public lands.*'" Brief for Respondents 30 (quoting and adding emphasis to §3103(c)). In other words, if a Park Service regulation on its face applies only ("solely") to public lands,

_____

other words, Section 203 of ANILCA ties the Service's regulatory authority to the statute's immediately preceding statements of *public-land* acreage.

then the regulation shall not apply to a park's non-public lands. But if instead the regulation covers public and non-public lands alike, then the second sentence has nothing to say: The regulation can indeed cover both. See *ibid.* The Park Service labels that sentence a "tailored limitation" on its authority over inholdings. *Ibid.* And it concludes that the sentence has no bearing on the hovercraft rule, which expressly applies "without regard to . . . ownership." 36 CFR §1.2(a)(3).

But on the Park Service's view, Section 103(c)'s second sentence is a mere truism, not any kind of limitation (however "tailored"). Once again: It tells Alaskans, so the Park Service says, that rules applying only to public lands . . . will apply only to public lands. And that rules applying to both public and non-public lands . . . will apply to both. (Or, to say the same thing, but with approximate statutory definitions plugged in: It tells Alaskans that rules applying only to the Federal Government's lands . . . will apply only to the Federal Government's lands. And that rules applying to federal, state, Native, and private lands alike . . . will apply to them all.) In short, under the Park Service's reading, Section 103(c)'s second sentence does nothing but state the obvious. Its supposed exemption does not in fact exempt anyone from anything to which they would otherwise be subject. Remove the sentence from ANILCA and everything would be precisely the same. For it curtails none of the Service's ordinary regulatory authority over inholdings.[7]

_____

[7] And just to pile on: Even taken as a truism, the Park Service's view of the second sentence misfires, because of the technical difference between "public lands" and federally owned lands in ANILCA. Recall that "public lands" is defined in the statute to mean most but not all federally owned lands: The term excludes those federal lands selected for future transfer to the State or Native Corporations. See §3102(3); *supra,* at 9–10. (That is why when we reframed the Park Service's argument just above, we noted that we were using "approximate"

And more: The Park Service's reading of Section 103(c)'s second sentence also strips the first and third sentences of their core functions. Under the Service's approach, the first sentence's "deeming" has no point. There is no reason to pretend that inholdings are not part of a park if they can still be regulated as parklands. Nor is there a need to create a special legal fiction if the end result is to treat Alaskan inholdings no differently from those in the rest of the country. And similarly, the third sentence's acquisition option has far less utility if the Service has its full regulatory authority over lands the Federal Government does not own. Why cough up money to "administer[]" property as "part of the [system] unit" unless doing so makes a real difference, by removing a regulatory exemption otherwise in effect? The Service's reading effectively turns the whole of Section 103(c) into an inkblot.

And still more (if implicit in all the above): That construction would undermine ANILCA's grand bargain. Recall that ANILCA announced its Janus-faced nature in its statement of purpose, reflecting the century-long struggle over federal regulation of Alaska's resources. See *supra,* at 3–6. In that opening section, ANILCA spoke about safeguarding "natural, scenic, historic[,] recreational, and wildlife values." 16 U. S. C. §3101(a). Yet it insisted as well on "provid[ing] for" Alaska's (and its citizens') "economic and social needs." §3101(d). In keeping with the statute's conservation goal, Congress reserved

_____

statutory definitions.) But the Park Service's existing regulations apply, at a minimum, to *all* federally owned lands within a park's borders. See 36 CFR §1.2(a). That means there are no regulations "applicable solely to public lands" as defined in ANILCA. §3103(c). So when the Park Service argues that the second sentence exempts nonpublic lands from that single "class of [its] regulations," Brief for Respondents 18, 30, it is not even exempting those lands from obviously inapplicable regulations (as we assume in the text); instead, it is exempting them from a null set of rules.

huge tracts of land for national parks. But to protect Alaskans' economic well-being, it mitigated the consequences to non-federal owners whose land wound up in those new system units. See *supra,* at 17–20. Once again, even the Park Service acknowledges that Section 103(c) was supposed to provide an "assurance" that those owners would not be subject to all the regulatory constraints placed on neighboring federal properties. See Tr. of Oral Arg. 50; see *id.,* at 46–47; *supra,* at 9, 17, 20. But then the Service (head-spinningly) posits that it need only draft its regulations to cover both federal and non-federal lands in order to apply those rules to ANILCA's inholdings. On that view, limitations on the Service's authority are purely a matter of administrative grace, dependent on how narrowly (or broadly) the Service chooses to write its regulations. And ANILCA's carefully drawn balance is thrown off-kilter, as Alaskan, Native, and private inholdings are exposed to the full extent of the Service's regulatory authority.

The word "solely" in Section 103(c)'s second sentence does not support that kind of statute-gutting. We do not gainsay that the Park Service has identified a grammatically possible way of viewing that word's function: as pinpointing a narrow class of the Service's regulations (those "solely applicable to public lands").[8] But that reading, for all the reasons just stated, is "ultimately inconsistent" with the "text and context of the statute." *Sturgeon I,* 577 U. S., at \_\_\_ (slip op., at 12). And a different understanding of "solely" instead aligns with that text and context. That word encapsulates Congress's view that the Park Service's regulations should apply "solely" to public lands (and not to state, Native, or private ones). See

————————

[8] It is unfortunate for the Park Service's argument that the narrow class of regulations thus identified does not in fact exist. See n. 7, *supra.* But we put that point aside for the remainder of this paragraph.

*supra,* at 19, and n. 5. And the word serves to distinguish between the Park Service's rules and other regulations, both federal and state. Consider if Congress had exempted non-public lands in a system unit from regulations "applicable to public lands" there (without the "solely"). That language would apparently exempt those lands not just from park regulations but from a raft of others—*e.g.,* pollution regulations of the Environmental Protection Agency, water safety regulations of the Coast Guard, even employment regulations of Alaska itself. For those rules, too, apply to public lands inside national parks. By adding "solely," Congress made clear that the exemption granted was not from such generally applicable regulations. Instead, it was from rules applying only in national parks—*i.e.,* the newly looming Park Service rules. Congress thus ensured that inholdings would emerge from ANILCA not worse off—but also not better off—than before.[9]

––––––––––––

[9] The Park Service points to one provision of ANILCA that (it says) contemplates application of its rules to inholdings; but as suggested in the text that provision really envisions other agencies' regulations. Section 1301(b)(7) requires the Service to create for each system unit a land management plan that includes (among other things) a description of "privately owned areas" within the unit, the activities carried out there, and the "methods (such as cooperative agreements and issuance or enforcement of regulations)" for limiting those activities if appropriate. 16 U. S. C. §3191(b)(7). Nothing in that section "directs the Park Service" itself to issue or enforce regulations, as the Service now argues. See Brief for Respondents 30–31. Instead, the Service satisfies all its obligations under the provision by reporting on the panoply of federal and state statutes and regulations that apply to any non-public land (whether or not in a park). And indeed, the Service's management plans have taken exactly that form. See, *e.g.,* Dept. of Interior, Nat. Park Serv., Kobuk Valley National Park: Land Protection Plan 123–124 (1986) (noting that "[w]hile [Park Service] regulations do not generally apply to private lands in the park (Section 103, ANILCA)," the regulations "that do apply" include those issued under "the Alaska Anadromous Fish Act, the Endangered Species Act, the Clean Water and Clean Air acts, and the Protection of Wetlands, to name a few"); Dept. of Interior, Nat. Park Serv., Noatak National Preserve: Land Protection

The legislative history (for those who consider it) confirms, with unusual clarity, all we have said so far. The Senate Report notes that state, Native, and private lands in the new Alaskan parks would be subject to "[f]ederal laws and regulations of general applicability," such as "the Clean Air Act, the Water Pollution Control Act, [and] U. S. Army Corps of Engineers wetlands regulations." S. Rep. No. 96–413, p. 303 (1980). But that would not be so of regulations applying only to parks. The Senate Report states:

> "Those private lands, and those public lands owned by the State of Alaska or a subordinate political entity, are not to be construed as subject to the management regulations which may be adopted to manage and administer any national conservation system unit which is adjacent to, or surrounds, the private or non-Federal public lands." *Ibid.*

The sponsor of Section 103(c) in the House of Representatives described that provision's effect in similar terms. The section was designed, he observed, to ensure that ANILCA's new boundary lines would "not in any way change the status" of the state, Native, and private lands placed within them. 125 Cong. Rec. 11158 (1979) (statement of Rep. Seiberling). Those lands, he continued, "are not parts of th[e system] unit and are not subject to regulations which are applied" by virtue of being "part of the unit." *Ibid.* In short, whatever the new map might suggest, they are not subject to regulation as parkland.

We thus arrive again at the conclusion that the Park Service may not prevent John Sturgeon from driving his hovercraft on the Nation River. We held in an earlier part of this opinion that the Nation is not public land. See *supra,* at 12–15. And here we hold that it cannot be regu-

––––––––

Plan 138–139, 142 (1986) (similar).

lated as if it were. Park Service regulations—like the hovercraft rule—do not apply to non-public lands in Alaska even when those lands lie within national parks. Section 103(c) "deem[s]" those lands outside the parks and in so doing deprives the Service of regulatory authority.

IV

Yet the Park Service makes one last plea—for some kind of special rule relating to Alaskan navigable waters. Even suppose, the argument runs, that those waters do not count as "public lands." And even assume that Section 103(c) strips the Service of power to regulate *most* non-public lands. Still, the Service avers—invoking "the overall statutory scheme"—that ANILCA must at least allow it to regulate navigable waters. Brief for Respondents 40; see *id.,* at 40–45; Tr. of Oral Arg. 42 (ANILCA's regulatory restrictions were "not about navigable waters"); *id.,* at 63–64 (similar). Here, the Service points to ANILCA's general statement of purpose, which lists (among many other things) the "protect[ion] and preserv[ation]" of "rivers." 16 U. S. C. §3101(b). Similarly, the Service notes that the statements of purpose associated with particular system units refer to "protect[ing]" named rivers there. *E.g.,* §410hh–1(1). And the Service highlights several statutory sections that in some way speak to its ability to regulate motorboating and fishing within the new units. See §§3121, 3170, 3201, 3203(b), 3204.[10] According to the

——————

[10] The Park Service also points to a separate title of ANILCA, which raises issues outside the scope of this case. Title VI designates 26 named rivers in Alaska as "wild and scenic rivers," to be "administered by the Secretary" under the (nationwide) Wild and Scenic Rivers Act, 94 Stat. 2412–2413. According to the Service, those special designations (and associated management instructions) enable it to "administer the [specified] rivers pursuant to its general statutory authorities"— notwithstanding anything in Section 103(c). Brief for Respondents 42– 43. But the Nation River, all agree, is not a "wild and scenic river." We may therefore leave for another day the interplay between Section

Service, all of those provisions show that "ANILCA preserves [its] authority to regulate conduct on navigable waters" in national parks. Brief for Respondents 42.

But ANILCA does not readily allow the decoupling of navigable waters from other non-federally owned areas in Alaskan national parks for regulatory (or, indeed, any other) purposes. Section 103(c), as we have described, speaks of "lands (as such term is defined in th[e] Act)." 16 U. S. C. §3103(c); see *supra,* at 9. The Act, in turn, defines "land" to mean "lands, waters, and interests therein." §3102(1)–(3); see *supra,* at 9. So according to an express definition, when ANILCA refers to "lands," it means waters (including navigable waters) as well. And that kind of definition is "virtually conclusive." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 228 (2012); see *ibid.* ("It is very rare that a defined meaning can be replaced" or altered). Save for some exceptional reason, we must read ANILCA as treating identically solid ground and flowing water. So if the Park Service were right that it could regulate the Nation River under its ordinary authorities, then it also could regulate the private fields and farms in the surrounding park. And more to the point, once Section 103(c) is understood to preclude the regulation of those landed properties, then the same result follows—"virtually conclusive[ly]"—for the river.

And nothing in the few aquatic provisions to which the Park Service points can flip that strong presumption, for none conflicts with reading Section 103(c)'s regulatory exemption to cover non-federal waters. The most substantive of those provisions, as just noted, contemplate some role for the Service in regulating motorboating and fishing. But contra the Park Service, those sections have effect under our interpretation because both activities can occur on federally owned (and thus fully regulable) non-

———————

103(c) and Title VI.

navigable waters. The other provisions the Service emphasizes are statements of purpose, which by their nature "cannot override [a statute's] operative language." *Id.*, at 220. And anyway, our construction leaves the Park Service with multiple tools to "protect" rivers in Alaskan national parks, as those statements anticipate. §3101(b); §410hh–1(1). The Park Service may at a minimum regulate the public lands flanking rivers. It may, additionally, enter into "cooperative agreements" with the State (which holds the rivers' submerged lands) to preserve the rivers themselves. §3181(j). It may similarly propose that state or other federal agencies with appropriate jurisdiction undertake needed regulatory action on those rivers. See §3191(b)(7); see also Kobuk Valley: Land Protection Plan, at 118, 121 (recommending that the Alaska Department of Natural Resources classify navigable parts of the Kobuk River for preservation efforts). And if all else fails, the Park Service may invoke Section 103(c)'s third sentence to buy from Alaska the submerged lands of navigable waters—and then administer them as public lands. See §§3103(c), 3192; see also Kobuk Valley: Land Protection Plan, at 133 (proposing that if Alaska does not adequately protect the Kobuk River, the Park Service should "seek to acquire title to th[o]se state lands through exchange").

Those authorities, though falling short of the Service's usual power to administer navigable waters in system units, accord with ANILCA's "repeated[] recogni[tion] that Alaska is different." *Sturgeon I*, 577 U. S., at ___ (slip op., at 13). ANILCA's broadly drawn parks include stretches of some of the State's most important rivers, such as the Yukon and Kuskokwim. See Brief for State of Alaska as *Amicus Curiae* 12. And rivers function as the roads of Alaska, to an extent unknown anyplace else in the country. Over three-quarters of Alaska's 300 communities live in regions unconnected to the State's road system. See *id.,* at 11. Residents of those areas include many of Alaska's

poorest citizens, who rely on rivers for access to necessities like food and fuel. See *id.,* at 11–12. Who knows?—maybe John Sturgeon could have found a comparable hunting ground that did not involve traveling by hovercraft through a national park. But some Alaskans have no such options. The State's extreme climate and rugged terrain make them dependent on rivers to reach a market, a hospital, or a home. So ANILCA recognized that when it came to navigable waters—just as to non-federal lands—in the new parks, Alaska should be "the exception, not the rule." *Sturgeon I,* 577 U. S., at \_\_\_ (slip op., at 14). Which is to say, exempt from the Park Service's normal regulatory authority.

V

ANILCA, like much legislation, was a settlement. The statute set aside more than a hundred million acres of Alaska for conservation. In so doing, it enabled the Park Service to protect—if need be, through expansive regulation—"the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska." 16 U. S. C. §3101(d). But public lands (and waters) was where it drew the line—or, at any rate, the legal one. ANILCA changed nothing for all the state, Native, and private lands (and waters) swept within the new parks' boundaries. Those lands, of course, remain subject to all the regulatory powers they were before, exercised by the EPA, Coast Guard, and the like. But they did not become subject to new regulation by the happenstance of ending up within a national park. In those areas, Section 103(c) makes clear, Park Service administration does not replace local control. For that reason, park rangers cannot enforce the Service's hovercraft rule on the Nation River. And John Sturgeon can once again drive his hovercraft up that river to Moose Meadows.

We accordingly reverse the judgment below and remand

the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–949

_____

## JOHN STURGEON, PETITIONER *v.* BERT FROST, IN HIS OFFICIAL CAPACITY AS ALASKA REGIONAL DI-RECTOR OF THE NATIONAL PARK SERVICE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[March 26, 2019]

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG joins, concurring.

Professors have long asked law students to interpret a hypothetical ordinance that prohibits bringing "a vehicle into the park."[1]  The debate usually centers on what counts as a "vehicle."  Is a moped forbidden?  How about a baby stroller?  In this case, we can all agree that John Sturgeon's hovercraft is a vehicle.  But now we ask whether he has brought it "into the park"—and, if not, how a river's designation as "outside the park" will affect future attempts to regulate there.

The Court decides that the Nation River is not park-land, and I join the Court's opinion because it offers a cogent reading of §103(c) of the Alaska National Interest Lands Conservation Act (ANILCA), 94 Stat. 2371, 16 U. S. C. §3101 *et seq.*  I write separately to emphasize the important regulatory pathways that the Court's decision leaves open for future exploration.

The Court holds only that the National Park Service may not regulate the Nation River as if it were within

————————

[1] See A. Scalia & B. Garner, Reading Law: The Interpretation of Le-gal Texts 36 (2012); Hart, Positivism and the Separation of Law and Morals, 71 Harv. L. Rev. 593, 607 (1958).

Alaska's federal park system, not that the Service lacks all authority over the Nation River. A reading of ANILCA §103(c) that left the Service with no power whatsoever over navigable rivers in Alaska's parks would be untenable in light of ANILCA's other provisions, which state Congress' intent that the Service protect those very same rivers. Congress would not have set out this aim and simultaneously deprived the Service of all means to carry out the task.

Properly interpreted, ANILCA §103(c) cannot nullify Congress' purposes in enacting ANILCA. Even though the Service may not apply its ordinary park rules to nonpublic areas like the Nation River, two sources of Service authority over navigable rivers remain undisturbed by today's decision. First, as a default, the Service may well have authority to regulate *out*-of-park, nonpublic areas in the midst of parklands when doing so is necessary or proper to protect *in*-park, public areas—for instance, to ban pollution of the Nation River if necessary to preserve habitat on the riverbanks or to ban hovercraft use on that river if needed to protect adjacent public park areas. Nothing in ANILCA removes that power. Second, Congress most likely meant for the Service to retain power to regulate as parklands a particular subset of navigable rivers designated as "Wild and Scenic Rivers," although that particular authority does not, by its terms, apply to the Nation River.

Because the Court does not address these agency authorities, see *ante*, at 19, n. 5, 26–27, n. 10, I join its opinion. I also wish to emphasize, however, that the Court's opinion introduces limitations on—and thus could engender uncertainty regarding—the Service's authority over navigable rivers that run through Alaska's parks. If this is not what Congress intended, Congress should amend ANILCA to clarify the scope of the Service's authority.

I

Since the National Park System's creation in 1872, it has grown to include over 400 historic and recreation areas encompassing over 84 million acres. 54 U. S. C. §100101(b)(1)(A); 83 Fed. Reg. 2065 (2018). These areas provide habitat for 247 threatened or endangered species and received more than 325 million visitors in 2016 alone. *Id.,* at 2065–2066.

The task of protecting this vast park system principally falls to the Park Service. In the National Park Service Organic Act (Organic Act), 39 Stat. 535, Congress entrusted the Service with regulating to leave the parks "unimpaired for the enjoyment of future generations." 54 U. S. C. §100101(a). Congress empowered the agency to promulgate regulations "necessary or proper" for managing the Park System, including regulations "concerning boating and other activities on or relating to water located within [Park] System units." §§100751(a), (b). The Service has carried out this charge by enacting a wide range of regulations, including the ban on hovercraft use at issue. See 36 CFR §2.17(e) (2018).

Wielding its Organic Act authority, the Service applies many park rules on federally owned lands and waters it administers, as well as navigable waters "within the boundaries of the National Park System." See 36 CFR §§1.2(a)(1), (3). The title to lands beneath navigable waters, even within national parks, typically belongs to the States.[2] Because park boundaries can encompass both federally and nonfederally owned lands and waters, this means that some nonfederally owned waters are subject to Service regulations—at least outside of Alaska. See *ante,* at 7–8.

––––––––––––

[2] Under the Submerged Lands Act of 1953, each State has "title to and ownership of the lands beneath [its] navigable waters." 43 U. S. C. §1311(a); see *ante,* at 4, 13.

Against this backdrop, Congress enacted ANILCA. As the Court explains, ANILCA added millions of acres of federal land to the National Park System in Alaska and simultaneously swept around 18 million acres of nonfederally owned lands within the geographic boundary lines of the new Alaska parks. *Ante*, at 6–8; see also *Sturgeon* v. *Frost*, 577 U. S. ___, ___–___ (2016) (slip op., at 5–6). In ANILCA, Congress directed the Service to manage Alaska's new and expanded parks "as new areas of the National Park System" under its Organic Act authority. 94 Stat. 2383, 16 U. S. C. §410hh–2.

ANILCA reflects Congress' expectation that the Service will manage Alaska's parks with a particular focus on rivers and river systems. For instance, the agency must "maintain unimpaired the water habitat" for salmon in Katmai National Monument, preserve "the natural environmental integrity and scenic beauty of . . . rivers" in Gates of the Arctic National Park, and "maintain the environmental integrity of the entire Charley River basin, including streams, lakes and other natural features." §§410hh(4)(a), (10); §410hh–1(2); see also §§410hh(1), (6), (7)(a), (8)(a); §410hh–1(1). Some provisions of ANILCA direct the Service to regulate boating in Alaska's parklands. See, *e.g.,* §3170(a). Others command the Service to regulate fishing. See, *e.g.*, §3201. Together, these provisions make clear that Congress must have intended for the Park Service to have at least some authority over navigable waters within Alaska's parks.

And yet, ANILCA includes one provision that can be read to throw a wrench into that authority: §103(c). This provision says that "[o]nly those lands within the boundaries of any conservation system unit which are public lands (as such term is defined in this Act) shall be deemed to be included as a portion of such unit." 16 U. S. C. §3103(c). Section 103(c) then says that no state, native, or private lands "shall be subject to the regulations applica-

ble solely to public lands within such units," although the
Secretary may acquire those lands and administer them
as part of the unit. *Ibid.* ANILCA, in turn, defines "public
lands" as nearly all "lands, waters, and interests therein"
in which the United States has title. §§3102(1)–(3). Cru-
cially, Alaska has title to the lands under its navigable
waters. See n. 2, *supra*. If the Service's ordinary author-
ity over navigable waters within park boundaries is dimin-
ished in Alaska relative to everywhere else in the United
States, all agree that ANILCA §103(c) is the culprit.

## II

Thus we arrive at the crux of this case: How, if at all,
does ANILCA §103(c) circumscribe the Service's ordinary
authority over navigable rivers within the geographic
boundaries of national parks?

## A

I agree with the Court that the Service may not treat
every navigable river in Alaska as legally part of Alaska's
parks merely because those (nonpublic) rivers flow within
park boundaries. The majority ably explains why
ANILCA's text leads to this outcome. See *ante*, at 16–20.
According to ANILCA §103(c), navigable waters (at least
apart from Wild and Scenic Rivers) must be treated as
waters outside of park units for legal purposes. Thus they
may not be "subject to the regulations applicable solely to
public lands within such units." 16 U. S. C. §3103(c).[3]

―――――――
[3] Notably, the Park Service did not argue—nor does the Court's opin-
ion address—whether navigable waters may qualify as "public lands"
because the United States has title to some interest other than an
interest in reserved water rights. See §§3102(1)–(3). In particular, the
United States did not press the argument that the Federal Government
functionally holds title to the requisite interest because of the naviga-
tional servitude. See, *e.g., Kaiser Aetna* v. *United States*, 444 U. S. 164,
177 (1979) ("The navigational servitude . . . gives rise to an authority in
the Government to assure that [navigable] streams retain their capac-

This principle is all that is required to resolve Sturgeon's case. The hovercraft rule applies only inside park boundaries. 36 CFR §1.2(a) ("regulations contained in this chapter apply to all persons entering, using, visiting, or otherwise within . . . [w]aters subject to the jurisdiction of the United States located within the boundaries of the National Park System"). The Nation River is, for legal purposes, outside of park boundaries. The hovercraft rule therefore does not apply on the Nation River.

B

Critically, although the Court decides today that the Service may not regulate the Nation River "as part of the park," *ante*, at 16, the Court does not hold that ANILCA §103(c) strips the Service of all authority to protect navigable waters in Alaska. For good reason. It would be absurd to think that Congress intended for the Service to preserve Alaska's rivers, but left it without any tools to do so.

Imagine if all Service regulations could apply in Alaska's parklands only up to the banks of navigable rivers, and the Service lacked any authority whatsoever over the rivers themselves. If Jane Smith were to stand on the public bank of the Nation River, bag of trash in hand, Service rules could prohibit her from discarding the trash on the riverbank. See 36 CFR §2.14(a)(1). The rules also could bar her from intentionally disturbing wildlife breeding activities, §2.2(a)(2), making unreasonably loud noises, §2.12(a)(1)(ii), and introducing wildlife into the park ecosystem, §2.1(a)(2). But reading ANILCA §103(c) to bar any Park Service regulation of navigable waters would

_____

ity to serve as continuous highways for the purpose of navigation in interstate commerce"); *United States* v. *Rands*, 389 U. S. 121, 123 (1967) ("This power to regulate navigation confers upon the United States a 'dominant servitude'"); 43 U. S. C. §1314 (providing that the United States retains the navigational servitude in navigable waters).

permit Jane to evade those rules entirely if she were to wade into the river or paddle along the bank in a canoe. She could toss her trash bag in the water and amp up her speakers with impunity. Under this reading, the Park Service would be powerless to stop her. Jane's actions would likely harm flora and fauna on the banks of the river, which are public areas inside park boundaries. Jane's trash also could drift from a navigable (and thus out-of-park, nonpublic) stretch of the Nation River into a nonnavigable (and thus in-park, public) stretch of the same river.[4] So much for the Service's duty to maintain the "environmental integrity" of the Charley River basin "in its undeveloped natural condition," 16 U. S. C. §410hh(10).

How can the Service adequately protect Alaska's rivers if it cannot regulate? What is more, how can it maintain nearby park areas, such as riverbanks or nonnavigable park waters downstream, if it has no power to check the contamination of navigable waters? To achieve Congress' stated goals in creating Alaska's parks, the Service must have some authority to protect navigable rivers within those parks.[5]

---

[4] The navigability of a river is determined "on a segment-by-segment basis." *PPL Montana, LLC* v. *Montana*, 565 U. S. 576, 593 (2012); see also *id.,* at 594.

[5] Even if the Service cannot regulate the rivers itself, the majority says that the agency can enter into "cooperative agreements" with Alaska to regulate the rivers, 16 U. S. C. §3181(j), propose that state or other federal agencies take action to protect the rivers, §3191(b)(7), or buy the submerged lands from Alaska and then regulate them, §§3103(c), 3192. See *ante*, at 28. But Congress made the Service directly responsible for protecting Alaska's parks and park resources. The Service cannot carry out its duty to "manag[e]" the park areas, see §410hh, if it is estopped from promulgating necessary rules and regulations.

C

Thankfully, today's decision does not leave the Service without any authority over the Nation River and other rivers like it. Even though most navigable rivers in Alaska are not public parklands, Congress has left at least two avenues for the Service to achieve ANILCA's purposes. Neither is addressed by the Court's decision.

1

First, the Court expressly does not decide whether the Service may regulate navigable waters running through Alaska's parks as an adjunct to its authority over the parks themselves. See *ante*, 19, n. 5.[6] In my view, the Service likely retains power over navigable rivers that run through Alaska's parks when that power is necessary to protect Alaska's parklands.

The Service's default ability to regulate comes from the Organic Act. That Act gives the Service general authority to promulgate all regulations "necessary or proper" for managing park units, including power to regulate activities "on *or relating* to water located within [Park] System units." 54 U. S. C. §§100751(a), (b) (emphasis added). Nothing in the text of the Organic Act suggests that the Service is powerless over out-of-park areas in the midst of public parklands, like the Nation River.

This brings us back to Jane, this time canoeing down the Nation River with a gallon of toxic insecticide onboard.

_____

[6] The Court's interpretation prohibits the Service only from applying its usual, in-park rules to out-of-park areas. See, *e.g.*, *ante*, at 16 (nonpublic lands "may not be regulated as part of the park"); *ante*, at 18 (Section 103(c)'s exclusion "exempt[s] non-public lands . . . from the Park Service's ordinary regulatory authority"); *ante*, at 19 (the areas "are no longer subject to the Service's power over 'System units' and the 'water located within' them"); *ante*, at 22 (rejecting suggestion that inholdings can be "regulated as parklands"); *ante*, at 25 (the inholdings "are not subject to regulation as parkland").

If Jane spills the insecticide into the river, the effects will surely reach the riverbanks—public areas within the park's legal boundaries. An antipollution rule tailored to apply to the Nation River as it runs through the park thus could well be "necessary or proper" to manage the parklands on either side of the river, even though the river itself is not legally a part of the park. §100751(a). And if the pollution is likely to harm nonnavigable stretches of the river downstream—public waters that are "within" the park for legal purposes—the ban also could be authorized because it specifically concerns "activities . . . relating to water located within [Park] System units." §100751(b). Similar reasoning could justify a range of Service regulations, giving the Service substantial authority over navigable rivers inside geographic park boundaries in order to protect the parklands through which they flow.

Assuming that the Service has such authority over out-of-park areas pursuant to its Organic Act, nothing in ANILCA §103(c) takes it away. That section's first sentence explains that nonpublic lands are not part of Alaska's park units. See 16 U. S. C. §3103(c); *supra*, at 4–5. The second sentence then emphasizes that the Service cannot regulate nonpublic lands as if they were part of the park. Together, these sentences mean that the Service loses its authority to apply normal park rules to nonpublic lands, and instead can apply only those rules that it can justify by reference to the needs of other, public lands. For instance, the Service is unlikely to have power to apply rules against abandoning property, 36 CFR §2.22(a), or trespassing, §2.31(a)(1), to nonpublic lands amid parklands because doing so would have little or no impact on neighboring public areas within the legal boundaries of the park. But a Service regulation tailored to apply to nonparklands in order to protect sensitive surrounding parklands—like a rule against putting a toxic substance in the Nation River to stop harms to the riverbanks—would

present a different question. Such a regulation could be consistent with the Service's limited Organic Act authority over out-of-park areas, and it would not run afoul of ANILCA because it would not be applicable to public lands.

The Service's out-of-park authority is not at issue in this case given that the hovercraft regulation applies only within park boundaries, see *ante*, at 19, n. 5. Hovercraft can be unsightly, be loud, and disturb sensitive ecosystems within the park. See 48 Fed. Reg. 30258 (1983) ("The Service has determined that hovercraft should be prohibited because they provide virtually unlimited access to park areas and introduce a mechanical mode of transportation into locations where the intrusion of motorized equipment by sight or sound is generally inappropriate"). If the Service were to choose to apply its hovercraft ban to the Nation River, the agency could justify doing so in certain designated areas to protect a particular sensitivity in a surrounding (public) park area, including some habitats on the banks of the Nation River.

2

The Court also leaves open a second way for the Service to protect navigable rivers. Because the Nation River is not a designated Wild and Scenic River, the Court expressly does not decide the extent of the Service's power over such designated rivers. *Ante,* at 26–27, n. 10. If ANILCA §103(c) is to be harmonized with the remainder of the statute, the Service must possess authority to regulate fully, as parklands, at least that subset of rivers.[7]

_____

[7] This authority would supplement, not replace, the Service's authority over out-of-park navigable rivers, because the Service's authority over the Wild and Scenic Rivers alone cannot explain all of ANILCA's express references to protecting Alaskan rivers. For instance, ANILCA states Congress' expectation that the Service will manage the Kobuk River in Kobuk Valley National Park. See 16 U. S. C. §410hh(6). That

The Wild and Scenic Rivers Act, 16 U. S. C. §1271 *et seq*., established a system of rivers that "possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values." §1271. Congress created the system to "preserv[e]" designated rivers "in free-flowing condition." *Ibid*. Rivers can become part of the system if they are designated by an Act of Congress. §1273(a)(i).

ANILCA designated 26 Alaskan rivers as components of this system, more than doubling the mileage of the rivers in the system at the time. 16 U. S. C. §1274; S. Johnson & L. Comay, CRS Report for Congress, The National Wild and Scenic Rivers System: A Brief Overview 1 (2015); see §1281(c). ANILCA, in turn, expressly defines the Alaskan park system as including "any unit in Alaska of the . . . National Wild and Scenic Rivers Systems." §3102(4).

Although ANILCA §103(c) generally has the effect of removing navigable waters from the legal boundaries of Alaska's parks, Congress' highly specific definition of the Wild and Scenic Rivers as a portion of Alaska's park system overrides ANILCA §103(c)'s general carveout. "General language of a statutory provision . . . will not be held to apply to a matter specifically dealt with in another part of the same enactment." *D. Ginsberg & Sons, Inc.* v. *Popkin*, 285 U. S. 204, 208 (1932). To make sense of ANILCA §103(c) within the context of the rest of ANILCA, the Service should retain full authority to regulate the Wild and Scenic Rivers as parklands.

———————

portion of the river is not designated as a Wild and Scenic River, see §1274, but the Bureau of Land Management has found it to be navigable, see Dept. of Interior, Nat. Park Service, Kobuk Valley National Park: General Management Plan 65 (1987). The Service therefore must have another source of authority over the river if the statute's purpose provision is not to be deprived of meaning.

\*      \*      \*

One final note warrants mention.  Although I join the Court's opinion, I recognize that today's decision creates uncertainty concerning the extent of Service authority over navigable waters in Alaska's parks.  Courts ultimately may affirm some of the Service's authority over out-of-park areas and Wild and Scenic Rivers.  But that authority may be more circumscribed than the special needs of the parks require.  This would not only make it impossible for the Service to fulfill Congress' charge to preserve rivers, made plain in ANILCA itself, but also threaten the Service's ability to fulfill its broader duty to protect all of the parklands through which the rivers flow.  See, *e.g.,* 16 U. S. C. §410hh(6) (Kobuk Valley National Park "shall be managed . . . [t]o maintain the environmental integrity of the natural features of the Kobuk River Valley, including the Kobuk, Salmon, and other rivers").  Many of Alaska's navigable rivers course directly through the heart of protected parks, monuments, and preserves.  A decision that leaves the Service with no authority, or only highly constrained authority, over those rivers would undercut Congress' clear expectations in enacting ANILCA and could have exceedingly damaging consequences.

In light of the explicit instructions throughout ANILCA that the Service must regulate and protect rivers in Alaska, I am convinced that Congress intended the Service to possess meaningful authority over those rivers.  If I am correct, Congress can and should clarify the broad scope of the Service's authority over Alaska's navigable waters.