**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SAN FRANCISCO HERRING
ASSOCIATION,

*Plaintiff-Appellant,*

v.

U.S. DEPARTMENT OF THE INTERIOR;
DEB HAALAND, in her official
capacity as Secretary of the Interior;
UNITED STATES NATIONAL PARK
SERVICE; SHAWN BENGE, in his
official capacity as Deputy Director
of the National Park Service; LAURA
JOSS, in her official capacity as
General Superintendent of the
Golden Gate National Recreation
Area,

*Defendants-Appellees.*

No. 20-17412

D.C. No.
4:13-cv-01750-
JST

OPINION

Appeal from the United States District Court
for the Northern District of California
Jon S. Tigar, District Judge, Presiding

Argued and Submitted January 25, 2022
Pasadena, California

Filed May 10, 2022

Before:  J. Clifford Wallace and Daniel A. Bress, Circuit Judges, and Morrison C. England, Jr.,[*] District Judge.

Opinion by Judge Bress

---

**SUMMARY**[**]

---

**Golden Gate National Recreation Area Act**

The panel affirmed the district court's summary judgment in favor of the government in a lawsuit alleging that the National Park Service lacked authority to prohibit commercial herring fishing in the Golden Gate National Recreation Area.

The panel held that the text and structure of the Golden Gate National Recreation Area ("GGNRA") Act confirmed that Congress has given the Park Service administrative jurisdiction over the waters in question and authorized the Park Service to administer the navigable waters within the Recreation Area's boundaries one-quarter mile offshore.

The panel rejected appellant's argument that the Park Service could only administer the navigable waters of the GGNRA if the Service acquired a formal property interest in those waters from the State of California.  Nothing in the GGNRA Act imposed such an unusual (and potentially

---

[*] The Honorable Morrison C. England, Jr., United States District Judge for the Eastern District of California, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

unachievable) condition precedent upon the Park Service's usual authority over navigable waters within park boundaries. The language and context of the GGNRA Act instead reflected the commonsense conclusion that Congress did not include navigable waters within the boundaries of the GGNRA and direct their protection, only to severely hamstring the Park Service in accomplishing that objective. The Park Service therefore could administer the navigable waters of San Francisco Bay within the GGNRA, with the consequence that it may enforce its commercial fishing rules in those waters.

## COUNSEL

Todd R. Gregorian (argued) and Eric B. Young, Fenwick & West LLP, San Francisco, California; Stuart G. Gross, Gross & Klein LLP, San Francisco, California; for Plaintiff-Appellant.

Anna T. Katselas (argued), Andrew C. Mergen, Robert J. Lundman, and David w. Gehlert, Attorneys; Michael T. Pyle, Assistant United States Attorney; Todd Kim, Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Gregory Lind, Office of the Solicitor, United States Department of the Interior, Washington, D.C.;   for Defendants-Appellees.

**OPINION**

BRESS, Circuit Judge:

In 1972, Congress created the Golden Gate National Recreation Area (GGNRA), establishing a portion of San Francisco Bay as part of the National Park System. Congress included within the geographic boundaries of the GGNRA certain navigable waters that were already subject to the jurisdiction of the United States. The question in this case is whether the National Park Service may enforce in these offshore waters a prohibition on commercial fishing that applies generally in national parks. The answer to that question turns on whether Congress in the GGNRA's enabling act gave the Park Service statutory authority to administer the disputed waters of San Francisco Bay.

It quite clearly did. The text and structure of the GGNRA Act confirm that Congress has given the Park Service administrative jurisdiction over the waters in question. The contrary position of appellant San Francisco Herring Association, meanwhile, is untenable. The Association would have us hold that the Park Service could only administer the navigable waters of the GGNRA if the Service acquired a formal property interest in those waters from the State of California. But nothing in the GGNRA Act imposes such an unusual (and potentially unachievable) condition precedent upon the Park Service's usual authority over navigable waters within park boundaries. The language and context of the GGNRA Act instead reflect the commonsense conclusion that Congress did not include navigable waters within the boundaries of the GGNRA and direct their protection, only to severely hamstring the Park Service in accomplishing that objective. We therefore affirm the district court's summary judgment to the Park Service.

I

A

In 1916, Congress enacted the National Park Service Organic Act (Organic Act), ordering the Secretary of the Interior, through the Director of the National Park Service, to administer the National Park System "to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of [the same] in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101. "The System shall include any area of land and water administered by the Secretary, acting through the Director, for park, monument, historic, parkway, recreational, or other purposes." *Id.* § 100501.

To achieve these preservation objectives, the Organic Act delegated to the Secretary the authority to "prescribe such regulations as the Secretary considers necessary or proper for the use and management of System units." *Id.* § 100751(a). Relevant here, Congress in 1976 amended the Organic Act to clarify the Secretary's authority to "prescribe regulations . . . concerning boating and other activities on or relating to water located within System units, including water subject to the jurisdiction of the United States." *Id.* § 100751(b); *see also* Pub. L. No. 94-458, sec. 1, 90 Stat. 1939 (1976).

The Park Service has adopted a host of regulations governing activities within national park units. These Park Service regulations apply, *inter alia*, within "[t]he boundaries of federally owned lands and waters administered by the National Park Service" and within "[w]aters subject to the jurisdiction of the United States

located within the boundaries of the National Park System, including navigable waters." 36 C.F.R. §§ 1.2(a)(1), (3).

Park Service regulations generally do not apply to "non-federally owned lands and waters . . . located within National Park System boundaries." *Id.* § 1.2(b). However, for waters subject to the jurisdiction of the United States located within park boundaries, including navigable waters, the regulations apply "except in Alaska, without regard to the ownership of submerged lands, tidelands, or lowlands."[1] *Id.* § 1.2(a)(3). Under the regulations, and as relevant here, "boundary" "means the limits of lands or waters administered by the National Park Service as specified by Congress." *Id.* § 1.4(a).

In 1972, Congress established the GGNRA as part of the National Park System. Pub. L. No. 92-589, 86 Stat. 1299 (1972) (codified at 16 U.S.C. § 460bb *et seq.*). Covering land and waters in San Francisco Bay that Congress deemed to "possess[] outstanding natural, historic, scenic, and recreational values," the GGNRA Act provides that "the Secretary shall preserve the recreation area, as far as possible, in its natural setting, and protect it from development and uses which would destroy the scenic beauty and natural character of the area." 16 U.S.C. § 460bb. In managing the GGNRA, the Secretary "shall utilize the resources in a manner which will provide for the recreation and educational opportunities consistent with sound principles of land use planning and management." *Id.*

---

[1] The "Alaska exception" was added to the regulation after the Supreme Court's decision in *Sturgeon v. Frost*, 139 S. Ct. 1066 (2019), a case we discuss further below. *See* 5 Fed. Reg. 72956-01 (Nov. 16, 2020).

Because this case concerns the Park Service's authority under the GGNRA Act, it is necessary to explain the relevant provisions in some detail.  Section § 460bb-1 defines the physical boundaries of the GGNRA.  *Id.* § 460bb-1(a).  The Recreation Area is comprised of "the lands, waters, and submerged lands" within its drawn boundaries, as specifically identified on certain property records and referenced maps.  *Id.*  Section 460bb-1(a)(1), entitled "Initial lands," largely identifies lands and waters that were part of the GGNRA at the time of the Act's passage in 1972. *Compare* Pub. L. No. 92-589, § 2, 86 Stat. 1299 (1972) *with* Pub. L. No. 109-131, sec. 202, § 2(a), 119 Stat. 2566 (2005). Section § 460bb-1(a)(2), entitled "Additional lands," lists various lands and waters that have been added to the GGNRA over time.  *See* Pub. L. No. 93-544, § 2, 88 Stat. 1741 (1974); Pub. L. No. 95-625, sec. 317(a), § 2, 92 Stat. 3467 (1978); Pub. L. No. 96-199, sec. 103(a), § 2, 94 Stat. 67 (1980); Pub. L. No. 96-344, sec. 4(1), § 2, 94 Stat. 1133 (1980); Pub. L. No. 96-607, sec. 1001(1), § 2, 94 Stat. 3539 (1980); Pub. L. No. 102-299, sec. 2(b), § 2, 106 Stat. 236 (1992); Pub. L. No. 106-350, sec. 2, § 2, 114 Stat. 1361 (2000); Pub. L. No. 109-131, sec. 202, § 2, 119 Stat. 2566 (2005).

As relevant here, the boundaries of the GGNRA extend one-quarter mile offshore from Sausalito to Bolinas Bay in Marin County, around Alcatraz Island, and from Fort Mason to below Ocean Beach in San Francisco County.  *See* 16 U.S.C. § 460bb-1(a)(1).  This map in the record shows the relevant offshore boundaries:



The majority of these quarter-mile offshore areas were part
of the GGNRA upon its enactment in 1972. *See* H.R. Rep.
No. 92-1391, at 53–55 (1972) (appended maps of GGNRA's
original boundaries).

The next section of the Act, codified at 16 U.S.C.
§ 460bb-2, is entitled "Acquisition policy." This section
provides details on which federal properties would be
transferred to the GGNRA upon enactment and how the
Secretary may acquire additional lands, including non-
federal lands, that lie within the boundaries of the GGNRA.
16 U.S.C. § 460bb-2(a). Specifically, "[e]xcept as
hereinafter provided, Federal property within the boundaries
of the recreation area is hereby transferred without
consideration to the administrative jurisdiction of the
Secretary for the purposes of this subchapter," subject to
certain agreements between the Secretary and the agency
formerly having jurisdiction over the property. *Id.* In
considerable detail, § 460bb-2 then discusses the transfer of

various military properties, such as former forts and airfield space, into the GGNRA. *Id.* §§ 460bb-2(b)–(h).

With respect to future acquisitions, § 460bb-2 provides, in pertinent part, that "[w]ithin the boundaries of the recreation area, the Secretary may acquire lands, improvements, waters, or interests therein, by donation, purchase, exchange, or transfer." *Id.* § 460bb-2(a). However, "[a]ny lands, or interests therein, owned by the State of California or any political subdivision thereof, may be acquired only by donation." *Id.* The remainder of § 460bb-2 contains extensive provisions spelling out the mechanics of the Secretary's future land acquisitions, such as financing, deferred payments, and so forth. *Id.* §§ 460bb-2(m), (o).

The next section of the GGNRA Act, codified at 16 U.S.C. § 460bb-3, is entitled "Administration." In relevant part, this section states that:

> The Secretary shall administer the lands, waters, and interests therein acquired for the recreation area in accordance with the provisions of the [NPS Organic Act], as amended and supplemented, and the Secretary may utilize such statutory authority available to him for the conservation and management of wildlife and natural resources as he deems appropriate to carry out the purposes of this subchapter.

*Id.* § 460bb-3(a). As we will see, this provision is central to the Association's argument that the Park Service must acquire a formal property interest in navigable waters before it may administer them.

B

The San Francisco Herring Association is a California-based non-profit group composed of small business owners who fish in the Bay Area.  Suing on behalf of its members, the Association seeks to prevent the Department of Interior, the Park Service, and various agency officials (collectively, the Park Service) from enforcing in the GGNRA a commercial fishing prohibition that applies generally in national park units.  The regulation at issue, which was promulgated in 1983, prohibits "[c]ommercial fishing, except where specifically authorized by Federal statutory law."  36 C.F.R. § 2.3(d)(4).  Violations of this prohibition are punishable by fine and up to six months in prison.  *See id.* § 1.3(a).

Each year from approximately November to March, herring enter San Francisco Bay to spawn, concentrating along the shores of Sausalito and Tiburon.  Fishermen have caught herring from the Bay since at least the mid-nineteenth century, but more specialized fishing did not begin for herring roe, or eggs, until the 1960s.  According to the Association, the waters at issue in this case are essential to the roe fishery because fishing is concentrated in discrete spawning areas near the shore.

The California Department of Fish and Wildlife (CDFW) has extensively regulated the herring roe fishery since 1973 to ensure that the fishery is safe and sustainable.  Each year, prior to the beginning of the fishing season, CDFW issues an information packet to fishermen.  Although the parties dispute when the Park Service began to assert administrative jurisdiction over the navigable waters in the GGNRA, by 2007 CDFW was including a formal notice in its information packet stating that the National Park Service

had "exclusive jurisdiction" over the shoreline waters in question.

In 2013, the Association filed this lawsuit against the Park Service, alleging that the Service lacked the statutory authority to prohibit commercial herring fishing in the GGNRA. The district court disagreed and granted summary judgment for the government.

In two previous appeals, we held first that the district court lacked subject matter jurisdiction over the case because the Association had failed to identify any final agency action under the Administrative Procedure Act (APA), *see San Francisco Herring Ass'n v. U.S. Dep't of Interior (Herring I)*, 683 F. App'x 579, 580 (9th Cir. 2017), and then that the Association had later sufficiently alleged final agency action based on new allegations of specific enforcement efforts against individual fishermen. *See San Francisco Herring Ass'n v. U.S. Dep't of Interior (Herring II)*, 946 F.3d 564, 576–77 (9th Cir. 2019). On remand from *Herring II*, the district court then granted summary judgment to the Park Service, essentially reinstating its original decision that led to *Herring I*.

The Association has appealed for a third time. With the final agency action issue settled, we now confront the merits of the Association's statutory argument, reviewing the district court's grant of summary judgment de novo. *Ctr. for Biological Diversity v. Esper*, 958 F.3d 895, 903 (9th Cir. 2020).

II

Under the APA, a court may set aside final agency action if it determines that the action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory

right."  5 U.S.C. § 706(2)(C).  In this case, the Association maintains that, under the GGNRA Act, the Park Service lacks the authority to enforce its commercial fishing prohibition on navigable waters within the GGNRA's boundaries.  "When a party challenges agency action as inconsistent with the terms of a statute, courts apply the familiar analytical framework set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 [] (1984)."  *Corrigan v. Haaland*, 12 F.4th 901, 906–07 (9th Cir. 2021).  Under *Chevron*, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency must give effect to the unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 842–43.

In conducting this inquiry, we employ "traditional tools of statutory construction."  *Id.* at 843 n.9.  We construe a statute "in accordance with its ordinary and natural meaning," *N.L. v. Credit One Bank, N.A.*, 960 F.3d 1164, 1167 (9th Cir. 2020), recognizing that "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989).  *See also Nken v. Holder*, 556 U.S. 418, 426 (2009) ("[S]tatutory interpretation turns on the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." (quotations omitted)).

We hold that based on its language and structure, the GGNRA Act authorizes the Park Service to administer the navigable waters within the Recreation Area's boundaries one-quarter mile offshore.  The Park Service may therefore enforce its generally applicable commercial fishing prohibition in the disputed waters of the GGNRA.

A

Based on the statutory provisions as we set them out above, one might naturally assume that the Park Service of course has the statutory authority to administer navigable waters within the GGRNA's drawn geographic boundaries. But the Association argues otherwise, pointing specifically to § 460bb-3(a). That provision states in pertinent that "[t]he Secretary shall administer the lands, waters and interests *therein acquired* for the recreation area." 16 U.S.C. § 460bb-3(a) (emphasis added). The Association argues that for the Park Service to be able to "administer" the waters in question, it must first have "acquired" a formal property interest in them. Any such interest, the Association contends, is held by the State of California based on its alleged ownership of the submerged lands beneath the waters. Because the Park Service has not acquired from California any formal property interest in the disputed waters, the Association maintains that the Park Service lacks the power to administer these waters, with the result that it may not enforce its commercial fishing prohibition.

We do not think the Association's argument reflects the best reading of the statutory text. It is not disputed that the navigable waters at issue here are already within the jurisdiction of the United States, *i.e.*, subject to federal regulation. *See, e.g.*, *United States v. Rands*, 389 U.S. 121, 122–23 (1967) (discussing congressional power over navigable waters); *see also Utah Div. of State Lands v. United States*, 482 U.S. 193, 202 (1987) ("[E]ven if the land under navigable water passes to the State, the Federal Government may still control, develop, and use the waters for its own purposes."). And the Organic Act specifically gives the Secretary authority to "prescribe regulations . . . concerning boating and other activities on or relating to

water located within System units, *including water subject to the jurisdiction of the United States*."    54 U.S.C. § 100751(b) (emphasis added).   As the Supreme Court has explained, the Organic Act's "statutory grants of power make no distinctions based on the ownership of either lands or waters (or lands beneath waters)" within park boundaries. *Sturgeon v. Frost*, 139 S. Ct. 1066, 1076 (2019); *see also* 36 C.F.R. § 1.2(a)(3).  The Park Service's general rules and regulations apply unless a park-specific law is "in conflict" with the Organic Act.  54 U.S.C. § 100755(a).

There is no such conflict here.  Congress in the GGNRA Act squarely placed the navigable waters at issue here within the boundary lines of the Recreation Area.  *See* 16 U.S.C. § 460bb-1(a) (referenced maps).    Indeed, Congress intentionally incorporated maps that extended a defined quarter-mile-deep zone into the navigable waters of San Francisco Bay specifically to ensure that those waters would be regarded as part of the GGNRA.  *Id.*  Congress then expressly provided that in "carrying out the provisions of this subchapter, the Secretary shall preserve the recreation area, *as far as possible*, in its natural setting, and protect it from development and uses which would destroy the scenic beauty and natural character of the area."    *Id.* § 460bb (emphasis added).  Congress further directed the Secretary to "utilize such statutory authority available to him for the conservation and management of wildlife and natural resources as he deems appropriate to carry out the purposes of this subchapter."  *Id.* § 460bb-3(a).

Read together, these provisions show that Congress granted the Secretary the authority to administer navigable waters within the Recreation Area's boundaries that were already subject to federal jurisdiction.  To "acquire" means "[t]o gain possession or control of."  *Acquire*, Black's Law

Dictionary (8th ed. 2004).  It is well established that "running waters cannot be owned—whether by a government or by a private party." *Sturgeon*, 139 S. Ct. at 1078 (citing *Fed. Power Comm'n v. Mohawk Power Corp.*, 347 U.S. 239, 247 n.10 (1954)).  With that legal backdrop, of which Congress is presumed to be aware, *see, e.g.*, *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85 (1988), when Congress placed the disputed navigable waters within the boundaries of the GGNRA and directed their protection, the Park Service necessarily gained control over them, which is to say that it sufficiently "acquired" them for the purpose of administering them.  16 U.S.C. § 460bb-3(a).  There was quite clearly a transfer of authority over these waters to the Park Service.  *See id.* §§ 460bb, -2(a).  Thus, there was no requirement for the Park Service to further "acquire" some formal property interest in navigable waters that are already subject to the jurisdiction of the United States; that are specifically delineated as part of the GGNRA; and that cannot even be "owned" in the traditional sense.  *Sturgeon*, 139 S. Ct. at 1078.

The GGNRA's differential treatment of land and navigable waters confirms our reading of the statute.  In setting the boundaries of the GGNRA, Congress transferred existing federal lands into the GGNRA but also included within the boundaries of the Recreation Area nonfederal lands over which the Park Service otherwise lacked jurisdiction.  *See* 16 U.S.C. §§ 460bb-1, -2.  Congress then included extensive provisions for how the Secretary may acquire *land* but said nothing about how the Secretary might acquire *navigable waters*.  For example, with respect to property held by California, § 460bb-2(a) provides that "[a]ny lands, or interests therein, owned by the State of California or any political subdivision thereof, may be acquired only by donation," without making any mention of

the Secretary acquiring interests in navigable waters from the State. *Id.* § 460bb-2(a).

Other provisions are to similar effect. Section 460bb-2(m), for example, provides detailed provisions for how the Secretary may finance land acquisitions but provides no guidance for acquiring rights in navigable waters. Similarly, § 460bb-2(o), entitled "Payment deferral; scheduling; interest rate," explains that *"[i]n acquiring those lands* authorized by the Ninety-fifth Congress for the purposes of this subchapter, the Secretary may, when agreed upon by *the landowner involved*, defer payment or schedule payments." *Id.* § 460bb-2(o) (emphasis added). Notably absent is any comparable provision addressing payment deferral and scheduling of acquisitions of navigable waters—for waters that Congress specifically included in the GGNRA, no less. Taken together, these provisions lend additional support to the Park Service's basic point that Congress did not envision the Secretary having to further acquire from California formal property rights in navigable waters that were already subject to federal jurisdiction and specifically included in park boundaries.

Finally, the Association's position is not only an inferior reading of the statutory text but could result in a significant implausibility. The GGNRA Act prevents the Secretary from acquiring property through eminent domain. *Id.* § 460bb-2(a). And within the GGNRA the Secretary may only acquire land interests from California by donation. *Id.* Under the California Constitution, however, the State may not alienate property rights held in the public trust for purposes of fishing and navigation. *See* Cal. Const. Art. I, § 25, Art. X, § 4. The Association's position thus leads to the apparent outcome that Congress included the waters at issue within the boundaries of the Recreation Area, directed

the Secretary to "preserve the recreation area, *as far as possible*," 16 U.S.C. § 460-bb (emphasis added), and then made it potentially impossible for the Secretary to do so.  In its first amended complaint, the Association in fact affirmatively alleged that "the State of California could not have granted Defendants the right to prohibit fishing in the waters in question."

The Association now suggests in its briefing that there is "some conveyance" that would allow the Service to "administer the waters generally" "without offending public trust rights, and thus give the GGNRA Act meaning and effect."   But the Association has not sufficiently demonstrated how such a transaction with the State would work or whether it could even be accomplished when the waters themselves cannot be owned.  The principal case the Association cites concerned an action "by the state of California to quiet its title to certain *lands*." *People v. Cal. Fish Co.*, 138 P. 79, 81 (Cal. 1913) (emphasis added).  And even if the Association's contemplated conveyance were possible, the lack of any provision in the GGNRA for such a novel "acquisition" convinces us that this is not what Congress had in mind when it included the disputed waters within park boundaries and ordered the Park Service to protect the area to the fullest extent possible.

B

In its reply brief, the Association for the first time argued that the Supreme Court's decision in *Sturgeon* supports its interpretation of the GGNRA.  We disagree.  *Sturgeon* is distinguishable.  In fact, if anything, *Sturgeon* confirms that the Park Service's position here is the better one.

The dispute in *Sturgeon* arose from the Park Service's attempt to apply its regulation banning hovercrafts,

36 C.F.R. § 2.17(e), to a portion of the Nation River in the Yukon-Charley Rivers National Preserve, a park system unit in Alaska. *Sturgeon*, 139 S. Ct. at 1072. Sturgeon, a hovercraft-traveling moose hunter, argued that under the Alaska National Interest Lands Conversation Act (ANILCA), 16 U.S.C. § 3101 *et seq.*, the Park Service could not enforce its hovercraft ban in the disputed waters because in Alaska, "the Park Service has no power to regulate lands or waters that the Federal Government does not own." 139 S. Ct. at 1073.

National Park system units in Alaska—comprising nearly 44 million acres—are drawn based on geographical boundaries that include land held by the State, Indian tribes, and private landowners. *Id.* at 1076–77. In the usual course, "inholdings" such as these would typically be subject to Park Service regulations because under the Organic Act and implementing regulations, the Park Service is authorized to regulate within park boundaries without regard to ownership of the lands or waters. *Id.* at 1076 (citing 54 U.S.C. §§ 100751(a), 100751(b); 36 C.F.R. §§ 1.2(a)(3), 6.2). But the Supreme Court held that the Park Service could not apply its hovercraft ban to the disputed waters within park boundaries in Alaska because of statutory language unique to ANILCA, which was itself borne out of Alaska's unique history and geography. *Id.* at 1073–77.

The unique statutory language is found in Section 103(c) of ANILCA, which provides, in pertinent part, that "[o]nly those lands within the boundaries of any conservation system unit which are *public lands* (as such term is defined in this Act) shall be *deemed* to be included as a portion of such unit." 16 U.S.C. § 3103(c) (emphasis added). "[C]rucially," the Supreme Court explained in *Sturgeon*, 139 S. Ct. at 1076, the term "land" in ANILCA is defined to

mean "lands, *waters*, and interests therein."   16 U.S.C. § 3102(1) (emphasis added).   And "public lands" means "lands *the title* to which is in the United States."   *Id.* § 3102(2) (emphasis added); *see also id.* § 3102(3).

Based on this language, *Sturgeon* held, "[a]s a matter of geography, both public and non-public lands fall inside those parks' boundaries," but "as a matter of law, only public lands would be viewed as doing so." *Sturgeon*, 139 S. Ct. at 1081. *Sturgeon* thus held that the Park Service could not regulate the waters within the Yukon-Charley Rivers National Preserve.  The United States did not own "title" to the Nation River because, as we have noted, "running waters cannot be owned—whether by a government or by a private party." *Id.* at 1078.  And Alaska owned title to the lands beneath the river.  *Id.*[2]

The Association argues that § 460bb-3 in the GGNRA, which contains the alleged property interest acquisition requirement, is equivalent to Section 103(c) of ANILCA. But, in fact, § 460bb-3 differs meaningfully from Section 103(c).  The latter is explicit that "[o]nly" the "public lands" within any system unit's boundaries would be "deemed" a part of that unit.   16 U.S.C. § 3103(c).   And unlike the

---

[2] We need not resolve the complex dispute between the parties over who owns the submerged lands under the waters at issue here. Resolution of that disagreement would not answer the ultimate question of whether Congress specified that the Secretary had to further acquire a formal property interest in the navigable waters of San Francisco Bay before it could regulate them.  And if, as we hold today, Congress did give the Secretary authority to administer the navigable waters without requiring the Park Service to acquire a formal property interest from California, under the Organic Act and Park Service regulations formal ownership of the land beneath the waters is irrelevant.  *See Sturgeon*, 139 S. Ct. at 1076; 36 C.F.R. § 1.2(a)(3).

GGNRA Act, ANILCA expressly defines "lands" to include water. *Id.* § 3102(1). ANILCA is also clear that determining whether lands (or waters) are "public lands" depends on whether the United States has "the title" to them. *Id.* § 3102(2).

The GGNRA Act does not use similar language, nor does it explicitly "deem" waters inside the Recreation Area's boundaries as outside the National Park System entirely. *See Sturgeon*, 139 S. Ct. at 1081 ("The key word here is 'deemed.'"). Instead, the GGNRA reflects the opposite approach: the disputed navigable waters of San Francisco Bay are affirmatively part of the park, with no further requirement that anything more be done to make them so. That makes some sense considering that whereas ANILCA drew national park boundaries around *44 million acres* in Alaska—of which *18 million* were not owned by the federal government, *id.* at 1075—we are considering here a drastically smaller quarter-mile offshore zone that was specifically included as part of the GGNRA's boundaries. Congress did not draw a massive circle around San Francisco Bay that happened to include these waters; it instead intentionally identified specific quarter-mile offshore areas for designated inclusion in the park.

Moreover, while the GGNRA Act reflects an analogous approach to ANILCA when it comes to non-federal *land*, the GGNRA Act differs from ANILCA when it comes to navigable waters: it does not equate "land" with "navigable waters" for legal purposes. *Cf. id.* at 1086 ("ANILCA does not readily allow the decoupling of navigable waters from other non-federally owned areas in Alaskan national parks for regulatory . . . purposes."). Although "we must read ANILCA as treating identically solid ground and flowing water," *id.*, the text of the GGNRA Act does not reflect that

same approach.  That is because, as we explained above, the GGNRA Act makes extensive provision for the acquisition of non-federal lands and discusses at length particular properties for inclusion, but says nothing about acquiring property interests in navigable waters.

In short, *Sturgeon* shows that when Congress wants to disallow the Park Service from exercising its usual authority over navigable waters falling within the drawn boundaries of a national park system unit, Congress makes that intention clear.  As the Supreme Court noted, "[i]f Sturgeon lived in any other State, his suit would not have a prayer of success." *Id.* at 1080; *see also id.* at 1075 (explaining that in ANILCA, "Congress set aside extensive land for national parks and preserves—but on terms different from those governing such areas in the rest of the country"); *id.* at 1087 ("ANILCA recognized that when it came to navigable waters—just as to non-federal lands—in the new parks, Alaska should be the exception, not the rule." (quotations omitted)).

The Supreme Court in *Sturgeon* also made clear that its construction of ANILCA still "le[ft] the Park Service with multiple tools to 'protect' rivers in Alaskan national parks," including purchasing the submerged lands from Alaska.  *Id.* at 1086–87 (citing 16 U.S.C. § 3103(c)).  But as discussed above, the GGRNA Act disallows such purchases from California, 16 U.S.C. § 460bb-2(a), and the Association maintains that California law would impose its own set of restrictions on the alienation of rights held in the public trust, Cal. Const. Art. I, § 25, Art. X, § 4.  Unlike in *Sturgeon*, the Association's argument, if accepted, would make the Park Service's ability to protect the navigable waters in the GGNRA far more doubtful.

The substantial textual differences between ANILCA and the GGNRA Act thus confirm that *Sturgeon* does not

assist the Association, but instead supports the government. While Congress in ANILCA "created an Alaska-specific exception" to the Park Service's usual authority, *id.* at 1072, we conclude it did not create such an exception for the disputed navigable waters in San Francisco Bay. We therefore hold that the Park Service may administer the navigable waters of San Francisco Bay within the GGNRA, with the consequence that it may enforce its commercial fishing rules in those waters.[3]

**AFFIRMED.**

---

[3] Because we agree reviewing de novo that the Park Service prevails under the GGNRA Act, we do not address whether the Service's interpretation would be entitled to *Chevron* deference. And because we do not locate the Service's authority over the disputed waters in the National Park System Organic Act, we do not reach the Association's arguments regarding the canon against implied repeals.