RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0006p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────────

COMMONWEALTH OF KENTUCKY, et al.

                *Plaintiffs-Appellees*,

    *v.*

JOSEPH R. BIDEN, in his official capacity as President of the United States of America, et al.,

                *Defendants-Appellants*.

> No. 21-6147

─────────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Frankfort.
3:21-cv-00055—Gregory F. Van Tatenhove, District Judge.

Argued: July 21, 2022

Decided and Filed: January 12, 2023

Before: SILER, McKEAGUE, and LARSEN, Circuit Judges.

─────────────────

#### COUNSEL

**ARGUED:** Joshua Revesz, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Matthew F. Kuhn, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellees. **ON BRIEF:** Joshua Revesz, Anna O. Mohan, David L. Peters, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Matthew F. Kuhn, Barry L. Dunn, Brett R. Nolan, Alexander Y. Magera, Michael R. Wajda, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, Benjamin M. Flowers, Carol O'Brien, May Davis, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, James R. Flaiz, GEAGUA COUNTY PROSECUTOR'S OFFICE, Chardon, Ohio, Brandon J. Smith, Dianna Baker Shew, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellees. Henry C. Whitaker, OFFICE OF THE FLORIDA ATTORNEY GENERAL, Tallahassee, Florida, Steven P. Lehotsky, LEHOTSKY KELLER LLP, Washington, D.C., for Amici Curiae.

_____

**OPINION**

_____

LARSEN, Circuit Judge.   A fundamental tenet of our constitutional order is that the President's authority "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).  The critical question in this case is whether the President heeded this rule when he ordered all federal agencies to include in their new contracts a provision obligating contract recipients to require their employees to wear face masks at work and be vaccinated against COVID-19.  The President has claimed no inherent constitutional power here; instead, he maintains that the Federal Property and Administrative Services Act of 1949 authorized his order.  The district court and a motions panel of this court concluded that the President likely exceeded his powers under that Act.  We agree.  We therefore affirm the district court's decision to preliminarily enjoin the federal government from enforcing the mandate, but we modify the scope of the injunction.

I.

A.

When COVID-19 vaccines became widely available in the spring of 2021, the federal government largely left inoculation decisions to the people and the States.  But on September 9, 2021—the same day that he ordered the Occupational Safety and Health Administration to make private employers mandate vaccination, *see NFIB v. OSHA*, 142 S. Ct. 661, 663 (2022) (per curiam)—the President announced that he would require federal contractors to do the same: "If you want to do business with the federal government, vaccinate your workforce."  Remarks by President Biden on Fighting the COVID-19 Pandemic (Sept. 9, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/.  The President ordered all executive agencies to include in their new and renewed contracts a clause specifying that the contractor and all subcontractors would obey COVID-19 safety guidance issued by the Safer Federal Workforce Task Force.  Exec. Order No. 14,042 § 2(a), 86 Fed. Reg. 50,985 (Sept. 9, 2021).  The President

also ordered the Director of the Office of Management and Budget to "determine whether [the Task Force's] Guidance will promote economy and efficiency in Federal contracting." *Id.* § 2(c).

The Task Force soon issued its "guidance"—a curious term given that it *required* contractors to ensure that their covered employees are vaccinated. Safer Federal Workforce Task Force, *COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors* 5 (Sept. 24, 2021), https://www.saferfederalworkforce.gov/downloads/Draft%20contractor%20 guidance%20doc_20210922.pdf. The "guidance" also required contractors to ensure that fully vaccinated employees working in areas of high community transmission wear a face mask while indoors, and that unvaccinated employees mask and socially distance regardless of local transmission rates. *Id.* at 6. The Director of the Office of Management and Budget then published a one-paragraph notice concluding that following the guidance would "improve economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract." 86 Fed. Reg. 53,691, 53,692 (Sept. 28, 2021). Perhaps recognizing the vulnerability of that terse statement, the Director later replaced it with a significantly longer one. *See* 86 Fed. Reg. 63,418 (Nov. 16, 2021). But the bottom line was the same: The contractor mandate would "improve efficiency in Federal contracting" by decreasing absenteeism and reducing labor costs. *Id.* at 63,421–23.

The mandate's scope is stunning. It is undisputed that approximately 20% of the nation's labor force works for a federal contractor. And once one unravels the guidance's nest of expansive definitions of "covered employee" and "covered contractor," "the difficult issue is understanding who" amongst that population "could possibly *not* be covered." *Kentucky v. Biden* (*Kentucky II*), 23 F.4th 585, 591 (6th Cir. 2022). "Covered contractors" include both prime and subcontractors; covered employees include anyone working on or "in connection with" a covered contract, *or* at a covered workplace; and a "covered workplace" includes anywhere even a single employee works on or, again, "in connection with," a covered contract, whether indoors or outdoors. Task Force Guidance, *supra*, at 3–4, 10–11. The upshot is that the President's order effectively mandates vaccination for tens of millions of Americans.

As authority for issuing this sweeping directive the President relied not on any landmark legislation or broad emergency authority, but on a 70-year-old procurement statute, the Federal Property and Administrative Services Act of 1949 (Property Act).  We turn to that Act now.

B.

Drawing on lessons the government had learned through military procurement during World War II, Congress set out to streamline its internal operations in the years following the War.  James F. Nagle, A HISTORY OF GOVERNMENT CONTRACTING 466–68 (1992 ed.).  On the civilian side, that effort culminated in the passage of the Property Act, Pub. L. No. 81-152, 63 Stat. 377 (1949), which aimed to "provide for the Government an economical and efficient system" for "the procurement and supply of personal property and nonpersonal services, including related functions such as contracting, . . . storage, . . . and records management," *id.* § 2.  To that end, the Property Act created the now-familiar General Services Administration, which assumed the procurement powers of numerous prior agencies.  *Id.* §§ 101–105.  And consistent with its theme of centralization, *see* Nagle, *supra* at 470–71, the Property Act authorized the President to issue directives to effectuate its provisions, Pub. L. No. 81-152 § 205(a).  Congress recodified the Property Act a few decades later.  Pub. L. No. 107-217, 116 Stat. 1062 (2002).

Two provisions of the Property Act are at issue in this case.  In their current form, they provide:

§ 101—Purpose

The purpose of this subtitle is to provide the Federal Government with an economical and efficient system for the following activities:

(1) Procuring and supplying property and nonpersonal services, and performing related functions including contracting, inspection, storage, issue, setting specifications, identification and classification, transportation and traffic management, establishment of pools or systems for transportation of Government personnel and property by motor vehicle within specific areas, management of public utility services, repairing and converting, establishment of inventory levels, establishment of forms and procedures, and representation before federal and state regulatory bodies.

(2) Using available property.

(3) Disposing of surplus property.

(4) Records management.

§ 121(a)—Administrative

The President may prescribe policies and directives that the President considers necessary to carry out this subtitle. The policies must be consistent with this subtitle.

40 U.S.C. §§ 101, 121(a).

The Presidents' earliest invocations of the Property Act matched its relatively modest scope. President Truman established a "Federal Fire Council" within the General Services Administration and tasked it with protecting federal employees from fire hazards. Exec. Order No. 10,257, 16 Fed. Reg. 6,013 (June 26, 1951). President Eisenhower prescribed rules for the establishment and maintenance of interagency motor-vehicle pools, Exec. Order No. 10,579, 19 Fed. Reg. 7,925 (Dec. 2, 1954), and directed agencies to obtain new flags upon Hawaii's admission as a State, Exec. Order No. 10,834, 24 Fed. Reg. 6,865 (Aug. 25, 1959). And Presidents Kennedy and Nixon set rules for obtaining, managing, and relinquishing real property. Exec. Order No. 11,035, 27 Fed. Reg. 6,519 (July 11, 1962); Exec. Order No. 11,508, 35 Fed. Reg. 2,855 (Feb. 12, 1970). To be sure, administrations in this period also used federal contracting to achieve broader policy goals (namely, outlawing race discrimination) through conditions that regulated contractors, but they did not invoke the Property Act in doing so. *See, e.g.*, Exec. Order No. 11,246, 30 Fed. Reg. 12,319, 12,319–20 (Sept. 28, 1965) (citing "the Constitution and statutes of the United States" for authority to include in all federal contracts a provision prohibiting race discrimination); *see also AFL-CIO v. Kahn*, 618 F.2d 784, 790–91, & nn.32–33 (D.C. Cir. 1979) (en banc) (collecting executive orders prohibiting discrimination by federal contractors but noting that none expressly relied upon the Property Act).

That pattern changed in 1971 after the Third Circuit concluded that the Property Act "seem[ed] to" provide authority for an executive order barring racial discrimination by government contractors, even though the President himself had not cited the Act. *Contractors Ass'n of E. Pa. v. Sec'y of Lab.*, 442 F.2d 159, 170 (3d Cir. 1971). In 1978, President Carter was the first to expressly rely on the Property Act to set rules for contractors directly, ordering them

to abide by federal price and wage regulations. Exec. Order No. 12,092, 43 Fed. Reg. 51,375 (Nov. 3, 1978). The D.C. Circuit sanctioned that reliance the next year. *Kahn*, 618 F.2d at 793. Since then, Presidents have repeatedly turned to the Property Act for authority to regulate the relationship between contractors and their employees. *See, e.g.*, Exec. Order No. 12,954, 60 Fed. Reg. 13,023 (Mar. 8, 1995) (prohibiting contractors from replacing striking employees); Exec. Order No. 13,201, 66 Fed. Reg. 11,221 (Feb. 17, 2001) (requiring contractors to notify employees of labor-law rights); Exec. Order No. 13,465, 73 Fed. Reg. 33,285 (June 6, 2008) (requiring contractors to use an immigration-status verification system); Exec. Order No. 13,706, 80 Fed. Reg. 54,697 (Sept. 7, 2015) (requiring contractors to provide paid sick leave). And now the current Administration has invoked the Property Act to mandate that federal contractors require their employees to be vaccinated.

C.

Shortly after the President issued the contractor mandate, Ohio, Kentucky, Tennessee, and two Ohio sheriff's offices sued the President and numerous federal officials, seeking to prevent enforcement of the mandate. The plaintiffs challenged the executive actions on a host of statutory, administrative, and constitutional grounds and moved for a preliminary injunction.

The district court granted that request, enjoining the government from enforcing the mandate against any covered contract in the three plaintiff States. *Kentucky v. Biden* (*Kentucky I*), 571 F. Supp. 3d 715, 735 (E.D. Ky. 2021). Most relevant here, the court concluded that the President likely exceeded his authority under the Property Act. *Id.* at 726–27. "[I]t strains credulity," the court said, to conclude that "a procurement statute" could "be the basis for promulgating a public health measure such as mandatory vaccination." *Id.* at 726. The court identified three ways in which the plaintiffs would be injured absent a preliminary injunction: lost contracting opportunities, unrecoverable compliance costs, and intrusion on the States' police powers. *Id.* at 734. Finally, the court concluded that although equitable relief typically should be limited to the parties before the court, the mandate's harms "rest[] on facts that are universally present" for "contractors and subcontractors in all of the states," and thus it decided to enjoin enforcement of the mandate against "all covered contracts" in the plaintiff States. *Id.* at 734–35.

The federal government immediately appealed, and this court denied the government's motion to stay the injunction pending appeal. *Kentucky II*, 23 F.4th at 589. The stay panel concluded that the federal government was unlikely to succeed in showing that the Property Act authorized the contractor mandate. *Id.* at 610. The court identified four flaws in the government's statutory argument: (1) it "heav[ily] reli[es]" on a purpose provision as a delegation of operative power, *id.* at 604; (2) even ignoring that problem, the statute authorized the President to issue rules necessary to promote "an economical and efficient *system*" of procurement, not any rule making contractors themselves more efficient, *id.* at 603–06 (emphasis added); (3) the major-questions doctrine counseled against the federal government's broad reading of the Property Act, *id.* at 606–08; and (4) the federalism canon cut against the government's claim of authority to order a public health measure, *id.* at 608–10. The stay panel's bottom line was simple: "By its plain text, the Property Act does not authorize the contractor mandate." *Id.* at 604.

We now consider the federal government's appeal of the district court's order preliminarily enjoining enforcement of the mandate.

## II.

The government challenges both the issuance and scope of the district court's injunction.

> We consider four factors in determining whether a preliminary injunction should issue: (1) whether the moving party has shown a likelihood of success on the merits; (2) whether the moving party will be irreparably injured absent an injunction; (3) whether issuing an injunction will harm other parties to the litigation; and (4) whether an injunction is in the public interest.

*Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021). The first factor is the most important, *see Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020) (per curiam), and we review that legal question de novo, *Thompson v. DeWine*, 976 F.3d 610, 614–15 (6th Cir. 2020). We review the district court's decision to issue a preliminary injunction for abuse of discretion. *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019).

A.

We begin with the likelihood that the plaintiffs will be able to show that the President exceeded his authority under the Property Act. The government claims that two sections of the Property Act, considered together, authorize the President's action. Start with 40 U.S.C. § 121(a), which authorizes the President to "prescribe policies and directives that [he] considers necessary to carry out this subtitle," if the policies are "consistent with this subtitle." Now add the Act's purpose statement:

> The purpose of this subtitle is to provide the Federal Government with an economical and efficient system for the following activities:

> (1) Procuring and supplying property and nonpersonal services, and performing related functions including contracting, inspection, storage, issue, setting specifications, identification and classification, transportation and traffic management, establishment of pools or systems for transportation of Government personnel and property by motor vehicle within specific areas, management of public utility services, repairing and converting, establishment of inventory levels, establishment of forms and procedures, and representation before federal and state regulatory bodies.

40 U.S.C. § 101. The sum, according to the government, is the power to "issue orders that improve the economy and efficiency of contractors' operations." Appellant Br. at 18.

The government's statutory arithmetic starts with a fundamental error: It searches for power in a powerless provision. *See Kentucky II*, 23 F.4th at 604 (criticizing the government's "heavy reliance" on the purpose statement); *Georgia v. President of the United States*, 46 F.4th 1283, 1298 (11th Cir. 2022) (opinion of Grant, J.) (similar). A statutory statement of purpose provides no legal authority. *Yazoo & M.V.R. Co. v. Thomas*, 132 U.S. 174, 188 (1889); *Ass'n of Am. R.R.s v. Costle*, 562 F.2d 1310, 1316 (D.C. Cir. 1977); Antonin Scalia & Brian Garner, *Reading Law: The Interpretation of Legal Texts*, 217 (2012) ("[A] congressional expression of purpose has as much real-world effect as a congressional expression of apology."). The proposition that prologues, prefatory clauses, and purpose statements do not confer legal powers, rights, or duties is hardly controversial. Courts have recognized as much in interpreting all kinds of legal texts—the Constitution, *see District of Columbia v. Heller*, 554 U.S. 570, 578 & n.3 (2008); *Jacobson v. Massachusetts*, 197 U.S. 11, 22 (1905); statutes, *see Kingdomware*

*Techs., Inc. v. United States*, 579 U.S. 162, 173 (2016); *Yazoo*, 132 U.S. at 188; congressional resolutions, *Hawaii v. Off. of Hawaiian Affs.*, 556 U.S. 163, 175 (2009); and contracts, *Cain Rest. Co. v. Carrols Corp.*, 273 F. App'x 430, 434 (6th Cir. 2008), to name just a few. Indeed, just a few terms ago, the Supreme Court unanimously applied this rule, rejecting an assertion by the National Park Service that a statute's "general statement of purpose" could give it power that the Act's operative provisions did not confer. *See Sturgeon v. Frost*, 139 S. Ct. 1066, 1085–87 (2019). In the end, the government puts up no fight on this front, conceding that § 101 of the Property Act "is not an affirmative grant of authority." Reply Br. at 2.

To evade the problem of relying on a purpose provision, the government maintains that § 101's statement of purpose is merely a useful tool in interpreting the scope of the President's rulemaking power in § 121(a). We have no objection to that basic premise; a purpose statement may be a useful guide to construing statutory language. *Yazoo*, 132 U.S. at 188; *Gundy v. United States*, 139 S. Ct. 2116, 2127 (2019) (plurality); *Rubin v. Islamic Republic of Iran*, 830 F.3d 470, 480 (7th Cir. 2016). But what a purpose provision cannot do is "limit or expand the scope of the operative clause." *Heller*, 554 U.S. at 578; *accord Yazoo*, 132 U.S. at 188; *Costle*, 562 F.2d at 1316. Put differently, a purpose statement "cannot override a statute's operative language." *Sturgeon*, 139 S. Ct. at 1086 (quoting *Reading Law*, *supra*, at 220).

The operative language in § 121(a) empowers the President to issue directives necessary to effectuate the Property Act's substantive provisions, not its statement of purpose. *See Kentucky II*, 23 F.4th at 606 ("The President cannot 'carry out this subtitle' by exerting a power the subtitle never actually confers." (citation omitted)); *Georgia*, 46 F.4th at 1298 ("[Section 121(a)] does not give the President authority to 'carry out' the *purpose* of the statute."). The text of § 121(a) itself tells us as much. The phrase "carry out" requires a task to be done—something "to put into practice or effect." *Carry Out*, American Heritage Dictionary of the English Language (1969). Yet a purpose provision, on its own, does nothing. *Yazoo*, 132 U.S. at 188; *cf. Gundy*, 139 S. Ct. at 2146 (Gorsuch, J., dissenting) (explaining that a purpose provision "simply declares what Congress believed the *rest* of the statute's enacted provisions had already" done). True, "carry out" might sometimes refer to a goal rather than a task, but that would be a particularly odd construction of § 121(a). For one thing, that interpretation would be anomalous,

if not unprecedented. *Cf. Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505–06 (2010) (emphasizing that the "lack of historical precedent" for an agency structure is a "telling indication" that it is unlawful). When asked to provide examples (outside of the Property Act) of a court countenancing an agency's attempt to carry out a purpose provision, in addition to its operative provisions, the government could not provide a single one. More importantly, "no legislation pursues its purposes at all costs," *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (per curiam), and the Property Act is no exception. Through dozens of operative provisions, Congress chose the means by which to pursue the ends declared in § 101. We decline the government's invitation to construe § 121(a) as authorizing the President to ignore the limits inherent in the Property Act's operative provisions in favor of an "anything-goes" pursuit of a broad statutory purpose.

If more were needed, think for a moment about the relationship between the scope of the government's claimed authority (to "improve the economy and efficiency of contractors' operations"), and the place where it locates that power (a purpose statement combined with a vague grant of rulemaking power in an esoteric internal-management statute). Does that comport with "common sense as to the manner in which Congress is likely to delegate" such power? *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). If ever there were a "subtle device" for conferring vast regulatory power, *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 231 (1994), a general statement of purpose surely fits the bill, *see Gundy*, 139 S. Ct. at 2146 (Gorsuch, J., dissenting) (calling a statute's purpose provision an "unlikely corner[]" for discovering a fundamental part of a statutory scheme). *See also Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (famously quipping that Congress "does not . . . hide elephants in mouseholes").

Even if we were to indulge the government's reliance on the Property Act's declaration of purpose, we would still conclude that the contractor mandate is unlawful. *See Kentucky II*, 23 F.4th at 604–05. In the government's view, the Act "empowers the President to 'prescribe policies and directives that the President considers necessary' to 'provide the Federal Government with an economical and efficient system' for '[p]rocuring . . . property and nonpersonal services, and performing related functions including contracting.'" Appellant Br. 18

(quoting §§ 101, 121(a)).  As the stay panel noted, the most natural reading of this language is that it "authorizes the President to implement systems making the government's entry into contracts less duplicative and inefficient."  *Kentucky II*, 23 F.4th at 605 (emphasis omitted).  And the government does not contest that this language—an "economical and efficient system" of procurement—is internally focused, speaking to government efficiency, not contractor efficiency.  Recording of Oral Argument at 26:32–26:39 ("We don't dispute the stay panel's conclusion that 'system' points the court's analysis inward.").  Yet the government's justifications for the mandate center not on how it would make contract*ing* more efficient, but how it would make contract*ors* more efficient.  *E.g.*, 86 Fed. Reg. at 63,422.  ("Requiring any workers who have not yet done so to receive a COVID-19 vaccine would generate meaningful efficiency gains for Federal *contractors*." (emphasis added)).

The government tries to escape this problem by equating contract*or* efficiency with the efficiency of government contract*ing*.  Anything that makes performance of a government contract "more timely and less costly," the government says, will inevitably make the "procurement 'system' more 'economical and efficient.'"  Appellant Br. 26.  This is a non-sequitur.  The fact that goods and services are cheaper has no necessary relationship to whether the government's system of entering into contracts for those goods and services will be more efficient.

Finding no shelter in the statutory text, the government seeks refuge in out-of-circuit caselaw.  The leading case is the en banc D.C. Circuit's decision in *Kahn*, which held that the President did not exceed his powers under the Property Act by ordering federal contractors to comply with wage and price regulations because there was a "sufficiently close nexus" between those regulations and "the values of 'economy' and 'efficiency.'"  618 F.2d at 792.  In so holding, the court relied on the Act's declaration of purpose to give content to the textual delegation of authority to the President.  *Id.* at 783–89.  That logic, as we have explained, is mistaken.  *See also Georgia*, 46 F.4th at 1300 (criticizing *Kahn*'s "purpose-based approach, detached as it is from the Act's remaining text and structure").  Other cases on which the government relies simply assume that *Kahn*'s analysis was correct.  *See, e.g.*, *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 366–67 (D.C. Cir. 2003); *Liberty Mut. Ins. Co. v.*

*Friedman*, 639 F.2d 164, 170 (4th Cir. 1981) ("[a]ssuming, without deciding," that *Kahn*'s "nexus test" was correct but holding that the challenged order failed the test).

Indeed, the only other decision to independently adopt the government's reading of the Property Act, *Contractors Association*, is even less help to the government's case than *Kahn*. In cataloging the history of executive orders prohibiting discrimination by federal contractors, the court explained that while many of those orders relied on World War II-era defense statutes, two orders issued by President Eisenhower "seem[ed] to be" authorized by the Property Act, even though the President had not invoked that power. 442 F.2d at 170. In one paragraph, and without a single mention of the statutory language, the court concluded that the Property Act authorized two non-discrimination orders because the United States has an interest in reducing costs and delays in procurement. *Id.* That conclusion, moreover, was dictum. Neither Eisenhower order was before the court, and the order that was before the court involved construction projects in which the federal government merely provided financial assistance, rather than directly procuring the services, so it cannot have rested on the Property Act. *See id.* at 170–71. *Contractors Association*'s cursory and gratuitous assessment of the Property Act is far too thin a reed on which to rest the contractor mandate.

That the government can muster up (at most) two cases, *Kahn* and *Contractors Association*, reveals the weakness in its next argument: that Congress ratified those interpretations when it recodified the Property Act without substantive change. *See Reading Law*, *supra*, at 322. The prior-construction canon's force, however, varies directly with the consistency and frequency of the supposedly ratified decisions. Its force is stronger when the lower courts uniformly adopt a particular interpretation of an oft-invoked statute. *E.g.*, *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 535–36 (2015); *Samarripa v. Ormond*, 917 F.3d 515, 518 (6th Cir. 2019). But when, as here, there is merely a "smattering of lower court opinions," the canon is far weaker. *BP P.L.C. v. Mayor & City Council of Balt.*, 141 S. Ct. 1532, 1541 (2021); *see also Jama v. ICE*, 543 U.S. 335, 351 (2005) (rejecting ratification argument where "the supposed judicial consensus with respect to [a] provision boil[ed] down to the decisions of two Courts of Appeals").

In the end, the government asks us to give weight to the Executive Branch's longstanding interpretation and use of the Property Act. The government does not go so far as to suggest that past practice can create power where the statute creates none. It of course cannot, *Medellin v. Texas*, 552 U.S. 491, 531–32 (2008), and for the reasons we have explained, the plain text of the Property Act does not confer the authority to promulgate a rule, including the contractor mandate, that simply makes contractors more efficient. The government urges instead that the executive's early and longstanding practice sheds light on the statute's original meaning. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022). But the history of the Property Act is far more modest than the government claims. Recall that the earliest invocations of the Property Act dealt with the bread-and-butter of procurement—property management, sharing government vehicles, identifying unused property, and the like. To be sure, Presidents in the 1950s and 1960s used federal contracting as a tool to implement non-discrimination policies, but they did not cite the Property Act in doing so.[1] Indeed, the Supreme Court has already noted that "[t]he origins of the congressional authority for" those orders were "somewhat obscure and ha[d] been roundly debated by commentators and courts." *Chrysler Corp. v. Brown*, 441 U.S. 281, 304 (1979). It wasn't until 1978—nearly 30 years after the Property Act's enactment and 7 years after the Third Circuit in *Contractors Association* generously proposed the Property Act as a basis for an order that made no mention of it—that President Carter cited the Act as authority for executive action that would make contractors, rather than contracting, more efficient. If anything, the executive practice most contemporaneous with the Act's enactment—the modest orders pertaining to government carpools and flags—cuts against the government's current position. "[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." *West Virginia*, 142 S. Ct. at 2610 (quoting *FTC v. Bunte Bros., Inc.*, 312 U.S. 349, 352 (1941)).

---

[1] Of course, the enactment of Title VII of the Civil Rights Act of 1964 soon made those orders largely unnecessary, as it does today.

The Property Act does not authorize the President to issue directives that simply "improve the efficiency of contractors and subcontractors."  86 Fed. Reg. at 50985.  We thus agree with our colleagues that the plaintiffs are likely to succeed in showing that the President exceeded his authority in issuing the contractor mandate.**2**  *See Kentucky II*, 23 F.4th at 610; *see also Georgia*, 46 F.4th at 1301; *Louisiana v. Biden*, __ F.4th __, 2022 WL 17749291, at *12 (5th Cir. Dec. 19, 2022) (reaching the same conclusion on the ground that the contractor mandate violates the major-questions doctrine).

B.

Even with a high likelihood of success on the merits, a preliminary injunction is not warranted unless the plaintiffs are likely to suffer irreparable injury in the absence of interim relief.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *D.T.*, 942 F.3d at 326–27.  The district court concluded that the plaintiffs are likely to lose valuable government contracts and incur unrecoverable compliance costs if the mandate is not preliminarily enjoined.  *Kentucky I*, 571 F. Supp. 3d at 734.  We agree.

The record includes substantial evidence that each plaintiff currently receives funding through a contract with a federal agency, and that they will lose that funding unless they agree to modify the contract to include the vaccine mandate.  *See Kentucky II*, 23 F.4th at 611.  Without elaboration, the government responds that the contract modifications are "the product of bilateral agreement."  Appellant Br. 46–47.  If the government means to suggest that the unwanted vaccination clause in the modified contracts is attributable to the contractor's acceptance of the condition, rather than the challenged executive action, then we cannot agree.  As the Supreme Court recently explained in a related context, "an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred."  *FEC v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1647 (2022).  Likewise, if the government means to say that the plaintiffs could avoid injury by merely acquiescing to the government's attempt to modify the

---

**2**Because we are confident that the plain language of the Property Act does not authorize the contractor mandate under any standard, we need not decide whether this is the kind of "extraordinary case" that would warrant a higher standard.  *West Virginia*, 142 S. Ct. at 2609.

contract, we again disagree.  Plaintiffs need not "subject [themselves] to the very framework [they] say" is unlawful.  *Id.* at 1648.

The federal government's sovereign immunity typically makes monetary losses like these irreparable.  *Kentucky v. U.S. ex rel. Hagel*, 759 F.3d 588, 599 (6th Cir. 2014).  In a single footnote, the government counters that, at least for damages attributable to modifications of existing contracts, the plaintiffs could obtain monetary relief under the Contract Disputes Act, 41 U.S.C. § 7101 *et seq.*  Even if that were true, the loss of new or renewed contracts due to the imposition of the contractor mandate would remain irreparable.

The plaintiffs are also likely to incur unrecoverable compliance costs in the absence of a preliminary injunction.  The Task Force Guidance incorporated by the executive order requires employers to designate individuals to distribute information about the vaccination mandate and to collect documentation for the purpose of ensuring compliance.  Due to the federal government's sovereign immunity, those expenses, too, are unrecoverable.  *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021).  We recognize that some of our sister circuits have held that compliance costs do not qualify as irreparable harm because they commonly result from new government regulation.  *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005); *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980); *A.O. Smith Corp. v. FTC*, 530 F.2d 515, 527 (3d Cir. 1976).  Maybe so.  But in our view, the peculiarity and size of a harm affects its weight in the equitable balance, not whether it should enter the calculus at all.  *See NFIB*, 142 S. Ct. at 666 (including "billions of dollars in unrecoverable compliance costs" in its assessment of the equities); *see also Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part) ("[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs.").

## C.

The two remaining preliminary injunction factors—whether issuing the injunction would harm others and where the public interest lies—merge when the government is the defendant.  *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020).  Given that the plaintiffs have shown a

substantial likelihood of success on the merits and imminent irreparable injuries, the federal government faces a high hurdle in showing that these factors warrant withholding relief. It cannot meet that bar. As the stay panel explained, the federal government's current claims of urgency are difficult to swallow in the face of their dilatory response to the availability of vaccines. *Kentucky II*, 23 F.4th at 610–11. And at bottom, "the public interest lies in a correct application" of the law. *Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006) (citation omitted).

We conclude that the district court was correct to issue a preliminary injunction.

III.

We still must decide, however, whether the district court abused its discretion by prohibiting enforcement of the mandate against non-parties in the plaintiff States. We hold that it did.

The parties agree that federal courts should not issue relief that extends further than necessary to remedy the plaintiff's injury. Although a geographically limited injunction like the one issued here does not create all of the practical problems associated with "nationwide" or "universal" injunctions, *see Arizona v. Biden*, 31 F.4th 469, 484 (6th Cir. 2022) (Sutton, C.J., concurring), affording relief beyond the parties nonetheless raises substantial questions about federal courts' constitutional and equitable powers, *see id.* at 483; *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (mem.) (Gorsuch, J., concurring). We therefore take seriously the federal government's complaint about the overbreadth of the district court's injunction.

The plaintiff States offer two theories why the district court properly extended the injunction to non-parties. First, the States claim that if the injunction does not extend to non-parties, the federal government will "simply choose to do business with those against whom it could enforce the mandate." Appellee Br. at 41. Yet the States provide nothing but pure speculation that the government would switch providers.

The States' second theory fares no better.  The States rightly point out that they have a sovereign interest in enforcing their duly enacted laws, *see Kentucky II*, 23 F.4th at 599, and that the mandate purports to preempt those laws, Task Force Guidance, *supra*, at 13.  The States thus contend that the only way to prevent preemption is to prohibit enforcement of the mandate against any contractor in the state.  This theory falls flat with respect to the States' policies regarding the vaccination status of their own employees.  *See* Tenn. Code Ann. § 14-2-101; Amended Complaint, R. 22, PageID 410, 412.  An injunction barring the federal government from enforcing the mandate against the States would also run to the States' subdivisions and thus would not encroach on the States' own vaccination policies for state employees.  *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 362 (2009).

Tennessee also bars private businesses from inquiring about another person's vaccination status, Tenn. Code Ann. § 14-2-102(a).  We recognize the potential conflict:  one cannot ensure an employee is vaccinated without asking.  But this same Tennessee statute exempts federal contractors, subcontractors and "postsecondary grant[]" recipients if compliance with the Tennessee law "would result in a loss of federal funding."  Tenn. Code Ann. § 14-6-102(a).  Tennessee does not explain why a state-wide injunction is necessary to prevent preemption of its "don't ask" law, when the Tennessee statute itself provides exemptions from that rule.  Without more, Tennessee has not shown that an injunction extending to nonparties is a remedy "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *Arizona*, 31 F.4th at 484 (Sutton, C.J., concurring).

Because an injunction limited to the parties can adequately protect the plaintiffs' interests while the case is pending disposition on the merits, the district court abused its discretion in extending the preliminary injunction's protection to non-party contractors in the plaintiff States.

\* \* \*

We AFFIRM the district court's issuance of the injunction but MODIFY its scope to prohibit the federal government from enforcing the contractor mandate against the parties only.